## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CONAGRA BRANDS, INC., | ) | **<u>COMPLAINT</u>** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| CARGILL, INC., CARGILL MEAT | ) | |
| SOLUTIONS CORPORATION (A/K/A | ) | |
| CARGILL PROTEIN A/K/A CARGILL | ) | |
| PROTEIN – NORTH AMERICA), JBS | ) | |
| S.A., JBS USA FOOD COMPANY, | ) | |
| SWIFT BEEF COMPANY, JBS | ) | |
| PACKERLAND, INC., NATIONAL | ) | |
| BEEF PACKING COMPANY, TYSON | ) | |
| FOODS, INC., TYSON FRESH | ) | |
| MEATS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

I.     NATURE OF THIS ACTION ................................................................. 4

II.    JURISDICTION AND VENUE ......................................................... 13

III.   PARTIES ............................................................................................ 14

     A.     Plaintiff ................................................................................... 14

     B.     Defendants ............................................................................. 15

          (i)    The Cargill Defendants ............................................. 15

          (ii)    The JBS Defendants ................................................. 15

          (iii) The Tyson Defendants ............................................ 17

          (iv) National Beef Packing Company ........................... 18

     C.     Defendants and Their Subsidiaries and Affiliates ................ 18

     D.     Defendant Parent and Subsidiary Companies Share a Unity of Interest ............... 19

          (i)    The Cargill Defendants ............................................. 19

          (ii)    The JBS Defendants ................................................. 21

          (iii) The Tyson Defendants ............................................ 24

     E.     Defendants' Co-Conspirators ................................................ 26

     F.     Reciprocal Agency of Defendants and Co-Conspirators ...... 26

IV.   FACTUAL ALLEGATIONS ............................................................. 26

     A.     Industry Background .............................................................. 26

     B.     Operating Defendants' Agreement to Cut Production .......... 29

     C.     Direct Evidence of Defendants' Agreement ......................... 30

          (i)    Mr. Hooker Was Well Positioned to Know About OperatingDefendants' Agreement ............ 32

          (ii)    Witness 1 Learns of an Agreement among Defendants ................................. 34

     D.     The Available Data Corroborates Witness 1's Account ....... 36

     E.     Defendants Effectuate Their Agreement to Reduce Supply and Raise Prices ....... 43

          (i)    Defendants Slash Production in 2015 ....................... 43

          (ii)    Operating Defendants Continued to Artificially Limit Supply into 2016. ..... 47

          (iii) After Historic Cuts, Operating Defendants Continued to Keep Supply Restrained, Resulting in Higher Beef Prices and in 2017 and 2018 .............. 49

          (iv) In 2019 and 2020, Operating Defendants Continued Parallel Slaughter, Which Was Against Each Defendant's Independent Self-Interest ........................... 50

          (v)    Defendants Idled and Closed Plants, Refrained from ExpandingProcessing Capacity ...................... 53

     F.     Operating Defendants Signaled Their Conspiracy and Encouraged Each Other to

Maintain it ..................................................................................... 55

    (i)   Parallel Reductions in Cash Cattle Purchases and AnticompetitiveQueuing Conventions ............................................................ 58

G.    Defendants' Conspiracy Increased the Spread Between Cattle and Beef Prices .... 60

H.    Tyson Foods and, Jointly, JBS S.A. and JBS USA Falsely Claimed Their Record Profits Were Due to Market Prescience, Not Supply Constraints ........................ 62

I.    Additional Plus Factors Encouraging the Reasonable Inference of Defendants' Conspiracy .............................................................................. 64

    (i)   The Beef Market is Highly Concentrated .................................. 64

    (ii)  Beef is a Commodity Product .............................................. 65

    (iii) The Demand for Beef is Inelastic ........................................ 66

    (iv) The Beef Market has High Barriers to Entry ............................ 67

    (v)  Defendants Took Advantage of Multiple Opportunities to Collude .............. 68

    (vi) Defendants Exacerbated Their Supply Restraints by Continuing toReduce Their Imports ................................................................. 73

    (vii)The Production Cuts Were Implemented Despite Surging Beef Demand ...... 74

    (viii)   Defendants' Market Share Stability is Indicative of a Conspiracy ............ 75

J.    The Beef Industry Faces Governmental Inquiries and Investigations ................. 77

K.    Defendants Fraudulently Concealed Their Conspiracy ......................... 79

    (i)   The Cargill Defendants ..................................................... 82

    (ii)  The JBS Defendants ........................................................ 83

    (iii) National Beef ................................................................ 83

    (iv) The Tyson Defendants .................................................... 85

L.    Plaintiff Was Unable to Discover the Existence of Operating Defendants' Conspiracy .............................................................................. 86

M.    Plaintiff Exercised Due Diligence in Attempting to Discover its Claim .............. 88

V.    ANTITRUST INJURY ............................................................... 89

VI.    DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS.............. 91

    A.    Defendants Renewed their Conspiracy with New and Independent Acts.............. 91

    B.    Defendants Inflicted New and Accumulating Injury on Plaintiff ......................... 92

VII.    COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................... 94

VIII.    REQUEST FOR RELIEF ......................................................... 95

IX.    JURY TRIAL DEMANDED ...................................................... 97

Plaintiff Conagra Brands, Inc. by and through its undersigned counsel, files this Complaint against the Defendants identified below, for their illegal conspiracy, which increased the wholesale price for beef[1] sold in the United States beginning at least as early as 2015 and continuing through the present. Plaintiff brings this action against Defendants for injunctive relief and treble damages under the antitrust laws of the United States, and demands a trial by jury.

## I.    NATURE OF THIS ACTION

1.    Defendants Cargill, Inc., Cargill Meat Solutions Corporation (a/k/a Cargill Protein a/k/a Cargill Protein – North America) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), National Beef Packing Company ("National Beef"), Tyson Foods, Inc. ("Tyson Foods"), and Tyson Fresh Meats, Inc. ("Tyson Fresh") (collectively "Defendants") are the world's largest meat processing and packing companies, known in the industry as meatpackers or packers. In 2018, the operating company Defendants (CMS, JBS USA, Swift/Packerland, National Beef, and Tyson Fresh) (collectively "Operating Defendants") sold approximately 80 percent of the more than 25 billion pounds of fresh and frozen beef supplied to the U.S. market. Collectively, they controlled approximately 81 to 85 percent of the domestic cattle processed (or slaughtered) in the market throughout the Conspiracy Period. The next largest meatpacker had only a 2–3 percent market share.

---

[1] In this Complaint, "beef" includes boxed and case-ready meat processed by Defendants and other smaller, non-Defendant producers from fed cattle, including primal cuts, trim or sub-primal products, further-processed and value-added products, offal or variety products, and rendered products and by products. "Beef" also includes ground beef that it is processed, in whole or in part, from fed cattle. "Fed cattle" means steers and heifers raised in feedlots on concentrated diets to be produced and sold as beef.

2.      Since at least January 1, 2015 until the present (the "Conspiracy Period"), Defendants have exploited their market power in this highly concentrated market by conspiring to limit the supply, and fix the prices, of beef sold to Plaintiff in the U.S. wholesale market. The principal, but not exclusive, means Defendants have used to effectuate their conspiracy is a scheme to constrain artificially the supply of beef entering the domestic supply chain. Defendants' collusive restriction of the beef supply has had the intended effect of artificially inflating beef prices. As a result, Plaintiff paid higher prices than it would have paid in a competitive market.

3.      Recently, the U.S. Department of Justice ("DOJ") and U.S. Department of Agriculture ("USDA") launched investigations into whether Defendants fixed beef prices in the United States.  On June 4, 2020, news sources reported that the DOJ's Antitrust Division sent civil investigative demands to Defendants Tyson Foods, JBS SA, and Cargill, Inc., and to National Beef Inc. (a company related to Defendant National Beef) seeking information about their pricing practices dating back to January 2015.

4.      On March 12, 2020 testimony before the Senate Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies, Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices. Secretary Perdue expressed concern that meatpackers were paying lower prices for live cattle without passing the cost savings on to Plaintiff and other beef purchasers. As he explained, the difference between prices for live cattle and prices for wholesale beef was "historically high."

5.      On information and belief,[2] a confidential witness previously employed by Swift at its Cactus, Texas slaughter plant ("Witness 1") has confirmed the existence of a conspiracy among

---

[2] Plaintiff's allegations relating to Witness 1 and Witness 2 set forth in this Complaint are made on information and belief based on allegations contained in the Third Consolidated Amended Class Action Complaint filed in the District of Minnesota by Plaintiffs including the Ranchers Cattlemen Action Legal Fund. *Ranchers Cattlemen Action Legal Fund, et al. v. Tyson Foods, et al.*, Case

the Operating Defendants. The witness has confirmed that all of the Defendants agreed to reduce their cattle purchases and slaughter volumes for the purpose and effect of increasing their margins (i.e., the spread between what Defendants pay cattle ranchers for fed cattle and the price they charge purchasers like Plaintiff). Defendants' transactional data and slaughter volume records, information published by the USDA, and Defendants' public calls for industry-wide slaughter and capacity reductions corroborate Witness 1's account.

6.     In addition to the high concentration in the wholesale beef industry, other structural characteristics of the domestic beef market facilitate Defendants' conspiracy. Operating Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market. Their vital role is to purchase cattle from the nation's farmers and ranchers, slaughter and pack cattle into beef, and sell beef to purchasers like Plaintiff. Operating Defendants' gatekeeping role has enabled them to collusively control upstream and downstream beef pricing throughout the Conspiracy Period.

7.     Other market characteristics serve as plus factors and support the inference of collusion among Defendants during the Conspiracy Period.  These characteristics include producer concentration, high barriers to entry, inelastic demand, the commodity nature of beef, frequent opportunities to conspire,[3] strong demand, market share stability, and decreased imports. These

No. 19-cv-1222, DE 312 (D. Minn.). *See In re Cattle Antitrust Litigation,* Case No. 20-cv-1319, DE 238 (D. Minn. Sept. 14, 2021) (denying motions to dismiss, based, at least in part, on similar allegations relating to Witnesses 1 and 2).

[3] Indeed, these same Defendants are no strangers to allegations of having colluded with one another -- at times contemporaneous to the conspiracy alleged herein -- to artificially control their respective beef business costs in violation of the federal antitrust laws.  Defendants Cargill, Inc., Cargill Meat Solutions Corp., JBS USA Food Co., Tyson Foods, Inc., and National Beef Packing Co. are also among the "red meat wage" defendants recently accused in *Brown, et al. v. JBS USA Food Company, et al.* No. 22-cv-02946 (D. Colo.) of having conspired to fix, depress, maintain, and stabilize the compensation they paid to their workers at their respective red meat processing plants from 2014 to the present, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Based in part on class Plaintiffs' allegations of direct communications, exchanges of competitively

6

economic factors encouraged and fomented the formation of Defendants' conspiracy and continue to foster its successful operation.

8. Operating Defendants manipulated the fundamental mechanism of supply and demand operating in a beef market vulnerable to successful cartel formation and operation, and illegally collaborated to restrain and manage production of beef in the United States.

9. These practices created surpluses in the cattle market and shortages in the wholesale beef market. These artificial conditions, in turn, drove down the prices Operating Defendants paid for cattle and boosted the prices Operating Defendants commanded for beef. The result intended and achieved by Operating Defendants has been higher profit margins (i.e., meat margins) than would have existed in a competitive market.

10. This growth of Operating Defendants' margins was aided by the way supply and demand operate in the beef industry. The supply of cattle is insensitive to short-term price changes because of the long life cycle of livestock, livestock's perishable nature, and the lack of any alternative use for livestock. Beef demand is also relatively insensitive to price fluctuations. As a result, Operating Defendants' margins are very responsive to changes in the aggregate volume of slaughtered cattle.

11. Another form of interaction conducive to Defendants' collusion was frequent meetings between each other's executives and key employees. Trade association conferences and other industry events[4] offered convenient opportunities to exchange information, plans and

---

sensitive information, and meetings with and among the same Defendants named herein in furtherance of the red meat wage scheme, the district court in *Brown* recently denied these same Defendants' motions to dismiss, by order entered on September 27, 2023. (*See Brown v. JBS USA,* 2023 WL 6294161 [D.Colo. September 27, 2023]).

[4] *See* fn. 3, herein above: pending allegations in the "red meat wage" litigation against these same Defendants named herein include their participation in and exchanges of competitively sensitive information at meetings of the "Red Meat Survey Group." *Id.*

strategies, and to build relationships. As described throughout this complaint, Operating Defendants seized these opportunities to advance their collusive supply restrictions.

12.     By the beginning of 2015, Defendants had begun exploiting favorable market conditions to launch their conspiracy. At that time, they undertook a campaign of reducing and restraining the beef supply, which campaign persists today. Publicly available industry data demonstrate Operating Defendants' abrupt transition from competition to collusion. Joint management of their respective slaughter volumes during the Conspiracy Period is immediately apparent from Figure 1 below, which tracks their quarterly slaughter volumes and shows them moving in tandem.

**Figure 1.**



13.     The results of Defendants' agreement to coordinate slaughter reductions and volume are illustrated in Figures 2 and 3 below. Figure 2 compares the average annual beef catle slaughter by Operating Defendant and the smaller, non-defendant beef producers in the market

("Independent Packers") before the Conspiracy Period (2007–2014) to the same average during the first five years of the Conspiracy Period (2015–2019), the years for which data is available.

**Figure 2. Average Annual Commercial Slaughter of Cattle**



14.     Figure 3 also compares the Operating Defendants' and the Independent Packers' annual slaughter volumes during the Conspiracy Period and the pre-Conspiracy Period, but breaks out the slaughter volume for each year of the Conspiracy Period for which data is available. The graph confirms that Tyson Fresh, Swift/Packerland, CMS, and National Beef each slaughtered fewer fed cattle in every year in the Conspiracy Period compared to their pre-Conspiracy Period averages. It also shows that while Tyson Fresh, Swift/Packerland, CMS, and National Beef each gradually increased their slaughter volume from 2016 after their dramatic 2015 reductions, as the supply of fed cattle increased, their rate of increase was vastly outpaced by the slaughter volume increases of Independent Packers during the same period. Operating Defendants thus used periodic slaughter reductions and underutilized plant capacity to ensure their supply of beef never outstripped demand.

**Figure 3.**
**Average Pre-Conspiracy & Conspiracy Period Fed Cattle**
**Slaughter-Operating Defendant vs. Others[5]**



15.     These figures demonstrate that each Operating Defendant family curtailed its annual slaughter volumes during the Conspiracy Period, while the smaller beef processors collectively increased their slaughter volumes during the same period without making up the shortfall of beef created by the conspiracy.

16.     As an immediate consequence of Operating Defendants' reduced supply, the beef market experienced a dramatic change of price behavior. Before 2015, prices of cattle and beef predictably moved in tandem. That correlation was the natural economic relationship in a competitive market because beef is simply processed cattle.

17.     But, at the start of the Conspiracy Period, when Operating Defendants began to cut production, this fundamental economic relationship between cattle and beef prices abruptly changed. The degree of correlation of cattle and beef prices diverged (to Operating Defendants'

---

[5] National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition, its year-on-year slaughter volume was flat against 2018, while Independent Packers' collective slaughter volume rose by approximately 100,000 head (netting out National Beef's acquisition of Iowa Premium).

benefit) without any credible, non-collusive explanation. The relevant supply and demand factors in the industry no longer explained the prices charged to direct purchasers.

18. Starting in 2015, wholesale beef prices began to show unusual trends. The per-pound price of cattle had historically stayed within 20 to 40 cents of the per-pound average wholesale price of beef. But in 2015, the spread between those prices increased dramatically as Figure 4 and Figure 5 demonstrate:

**Figure 4.**



**Figure 5.**

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 through 2014 | $34.07 | |
| 2015 through 2018 | $54.24 | 59% |
| 2019 | $84.15 | 55% |
| 2020 | $125.05 | 49% |
| | | |
| 2010 through 2014 | $34.07 | |
| 2015 through 2020 | $71.03 | 109% |

19.     According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to present than during the preceding five years. From 2010 to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54 – a 59% increase. The spread continued to balloon, by 2020 reaching about $71, a 109% increase from the pre-conspiracy period average.

20.     Operating Defendants' ability to cut beef production while maintaining inflated beef prices during the Conspiracy Period provides compelling circumstantial evidence of their conspiracy. In a beef market free from collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase their market shares.

21.     In that environment, a competitor would not cut its purchases and suffer lost sales thereby compromising any hope of increasing its profit margin. Only colluding meatpackers would expect to benefit by reducing their purchases and slaughter of cattle – because they knew their would-be competitors would not be increasing their purchasing volumes as one would expect in a competitive market. By slashing their supply output in concert, Operating Defendants have been able to expand their profit margins, confident that none of them would grab volume from another.

22.     United by their conspiracy, Operating Defendants were confident that none of them would break ranks and disproportionately expand their beef production to satisfy unmet demand. Armed with this assurance, Operating Defendants improved their meat margins by achieving and sustaining an unprecedented gap between cattle and beef prices.

23.     Aided by their collective market power in the upstream (cattle) and downstream (beef) markets, Operating Defendants' conspiracy allowed them to steadily enlarge their operating margins throughout the Conspiracy Period. By the end of 2020, the two largest Defendants, Tyson

Foods and JBS USA, were reporting record margins in their beef business. Tyson Foods reported that its beef business' operating margin was nearly 10.7% percent – significantly eclipsing its 2014 beef business operating margin of 2.1%. JBS USA reported a higher average beef business EBITDA margin of 11.5% percent for the first three quarters of 2020.

24.     In summary, Defendants colluded during the Conspiracy Period to reduce supplies of beef in tandem thereby raising and fixing beef prices at levels higher than prices that would have prevailed had the beef market been competitive. As a direct result, Plaintiff suffered antitrust injury by paying illegally inflated prices for beef it purchased from Defendants.

## II.     JURISDICTION AND VENUE

25.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

26.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

27.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants transacted business in this District, is licensed to do business or is doing business in this District, or has an agent who transacted business in this District and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

28.     This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each Defendant (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and delivered or directed the manufacture, sale, shipment, and delivery of substantial quantities of beef throughout the United States, including in this District;

(c) had substantial contacts with the United States, including in this District; and (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

29.     The activities of the Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

## III.     PARTIES

### A.     Plaintiff

30.     Plaintiff Conagra Brands, Inc. ("Conagra" or "Plaintiff," throughout herein) is a Delaware corporation with its principal place of business in Chicago, Illinois. Conagra is one of North America's leading branded food companies. Conagra's brands include Healthy Choice®, Birds Eye®, Duncan Hines®, Marie Callender's®, Slim Jim®, Reddi-wip®, Duke's®, Gardein®, Banquet®, Hebrew National®, and Frontera®, among others. From 2015 to the present, Conagra and its subsidiaries, affiliates, and other owned or controlled entities and predecessors in interest (including Pinnacle Foods, Inc., which was acquired by Conagra in October 2018 and is no longer in operation) purchased beef or beef products at artificially inflated prices directly from various Defendants and their affiliates and Co-Conspirators, and it suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.

31.     Conagra is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15, U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26.

**B.      Defendants**

**(i)      The Cargill Defendants**

32.      Cargill, Inc. is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. During the Conspiracy Period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through Cargill, Inc.'s wholly owned or controlled affiliates, to purchasers in the United States. Cargill, Inc. is the parent company.

33.      Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("CMS") is a Cargill, Inc. subsidiary. CMS is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. CMS is the principal operating entity within Cargill, Inc.'s U.S. cattle and beef business and is a wholly owned subsidiary of Cargill, Inc. On information and belief, CMS owns directly, or indirectly through its subsidiaries, Cargill, Inc.'s U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

34.      Throughout the Conspiracy Period, Cargill, Inc. wholly owned, as a direct or indirect subsidiary, CMS and sold, along with CMS, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

35.      During the Conspiracy Period, Cargill, Inc. and CMS shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States, including Plaintiff, and in this District.

**(ii)      The JBS Defendants**

36.      Defendant JBS S.A. is a Brazilian corporation with its principal place of business at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. During the Conspiracy Period, JBS S.A. and/or its predecessors, wholly owned or controlled

subsidiaries, or affiliates sold beef in interstate commerce, directly or through JBS S.A.'s wholly owned or controlled affiliates, to purchasers in the United States. JBS S.A. is the parent company.

37.     JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity within JBS S.A.'s U.S. cattle and beef business and the contracting entity for certain of JBS S.A.'s purchases of fed cattle in the United States.

38.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s U.S. fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants. On information and belief, Swift contracts for the majority of fed cattle to be slaughtered at these plants.

39.     Defendant JBS Packerland, Inc. ("Packerland") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634.

40.     On information and belief, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s U.S. fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan, the Sun Land beef plant in Tolleson, Arizona, and the Moyer Packing plant in Souderton, Pennsylvania. On information and belief, Packerland contracts for the majority of fed cattle to be slaughtered at these plants.

41.     On information and belief, various senior staff and executives responsible for the operation of JBS's U.S. fed cattle and beef business during the Conspiracy Period were employed by each of JBS USA, Swift, and Packerland.

42.     Throughout the Conspiracy Period, JBS S.A. wholly owned, as direct or indirect subsidiaries, JBS USA, Swift, and Packerland and sold, along with JBS USA, Swift, and Packerland, beef in interstate commerce, directly or through these wholly owned or controlled affiliates, to purchasers in the United States.

43.     During the Conspiracy Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States, including Plaintiff, and in this District.

### (iii)     The Tyson Defendants

44.     Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Conspiracy Period, Tyson Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

45.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh is a Delaware corporation with its principal place of business at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh is the principal operating entity within Tyson Foods' U.S. cattle and beef business.

46.     On information and belief, Tyson Fresh owns directly, or indirectly through its subsidiaries, Tyson Foods' U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

47.     Throughout the Conspiracy Period, Tyson Foods wholly owned Tyson Fresh as a direct or indirect subsidiary, and along with Tyson Fresh sold beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

48.     On June 10, 2020, Tyson Foods announced it was fully cooperating with the DOJ's price-fixing investigation into the broiler chicken industry under the antitrust division's Corporate Leniency Program.

49.     During the Conspiracy Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States, including Plaintiff, and in this District.

### (iv)     National Beef Packing Company

50.     National Beef Packing Company ("National Beef") is a privately owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

51.     On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

### C.     Defendants and Their Subsidiaries and Affiliates

52.     "Defendants" includes all Defendants' predecessors, including beef meatpackers merged with or acquired by any Defendant and each Defendant's wholly owned or controlled subsidiaries or affiliates that sold beef in interstate commerce directly to purchasers in the United States during the Conspiracy Period.

53.     Each of the Defendants sold or distributed beef to direct purchasers or played a material role in the coordinated and collusive behavior alleged. All Defendants were active,

knowing participants in the conspiracy alleged, and their conduct, to the extent committed by the Operating Defendants, was known to and approved by their parent Defendants.

### D. Defendant Parent and Subsidiary Companies Share a Unity of Interest

54. The coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act.

55. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate, and their general corporate actions are guided or determined not by two separate corporate consciousnesses, but by one. Accordingly, the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise.

56. A parent and its wholly owned subsidiary always have a unity of purpose and thus act as a single enterprise whenever they engage in coordinated activity.

57. By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise that they entered into with their subsidiaries. In doing so, the parent Defendants engaged in sufficient independent participation in the conspiracy and had sufficient knowledge, intent, and involvement in Operating Defendants' conspiracy to be liable under the Sherman Act as a single enterprise with their subsidiaries.

58. During the Conspiracy Period, the parent Defendants shared a unity of corporate interest and operated as part of a single enterprise with their subsidiaries, the Operating Defendants, to advance their conspiracy.

#### (i) The Cargill Defendants

59. Rather than owning and operating subsidiaries to diversify risk and earn profits by investing in them, Cargill, Inc. formed subsidiaries to conduct business that it otherwise would

have conducted itself. To this end, Cargill, Inc. created CMS to conduct its business in the meat industry that Cargill, Inc. previously operated itself.

60. Cargill, Inc. presents itself and its subsidiaries to the public as a single unified enterprise. For example, on its website, Cargill, Inc. reports that it employs 155,000 workers in 70 countries. Plaintiff is informed and therefore believes and alleges that these numbers include CMS employees. Cargill, Inc. has also publicly announced consolidated revenues, earnings, and cash flow that Plaintiff believes include performance results from CMS's beef operations.

61. In the Letter to Stakeholders included in Cargill, Inc.'s 2019 Annual Report, Cargill, Inc. reported that it "delivered $2.82 billion in adjusted operating earnings in fiscal 2019 . . . . Revenues dipped 1% to $113.5 billion. Cash flow from operations totaled $5.19 billion." On information and belief, those statistics include earnings, revenues, and cash flows from all Cargill, Inc. subsidiaries as well as Cargill, Inc. itself. In the same document, Cargill, Inc. reported that its "[e]arnings were led by our North American protein businesses. With steady domestic and export demand, and plentiful cattle supplies, the beef business posted its third consecutive year of strong performance."

62. There is one unified system that processes both companies' purchase orders, which also demonstrates the relationship between Cargill, Inc. and CMS.

63. Further, Cargill, Inc. operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for CMS.

64. Cargill, Inc. plays an active role in managing CMS's business operations. As one example, Cargill, Inc.'s website reported that its chairman and CEO, David MacLennan, "supervised several businesses in Cargill Protein," which subsumes CMS.

65.     As another example, Cargill, Inc. describes the responsibilities of executive team member Brian Sikes as including "leading Cargill's global Protein and Salt businesses," overseeing "Cargill's protein business in North America and Europe," and leading "the transformation of the North American protein business." On information and belief, Mr. Sikes lives in Wichita, Kansas, the principal place of business of CMS.

66.     Finally, Cargill, Inc.'s slaughter plants in Fresno, California, Wyalusing, Pennsylvania, and Friona, Texas all list either "Cargill" or "Cargill Beef" as DBAs with the USDA Food Safety Inspection Service.

67.     Cargill, Inc.'s extensive involvement in CMS's management and operations demonstrates these entities' unity of purpose (i.e., to profit from their price-fixing) and common objectives. Cargill, Inc.'s extensive involvement in CMS's management and operations demonstrates that Cargill, Inc. does far more than provide long-term strategy or guidance to CMS. Cargill, Inc. created CMS as its instrumentality to execute Cargill, Inc.'s directives. Throughout the Conspiracy Period, Cargill, Inc. exerted, and had the right to exert, control over CMS. In this manner, Cargill, Inc. independently participated in the illegal enterprise with CMS and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with CMS as a single enterprise.

(ii)     **The JBS Defendants**

68.     JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries. JBS S.A. established subsidiaries, including JBS USA, Swift, and Packerland, to conduct its business, including the purchase and processing of cattle and the sale of beef. Had JBS S.A. not created or acquired these subsidiaries, it would have performed these functions itself.

69.     JBS S.A. presents itself as a unified enterprise and conducts consolidated earnings calls on which its corporate representatives discuss the operations and profits of JBS S.A., including JBS USA, Swift, and Packerland. On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, which it refers to as "JBS beef," as a "division" or "business unit."  JBS S.A. commonly refers to JBS USA as its "JBS USA beef business[.]" As reported on JBS USA's financial statements, JBS USA "conducts its domestic beef and pork processing businesses through its wholly-owned subsidiaries Swift Beef Company ('Swift Beef'), Swift Pork Company ('Swift Pork') and JBS Packerland, Inc."

70.     Effective January 1, 2013, JBS S.A. appointed Andre Nogueira as JBS USA's CEO. He "report[ed] directly" to JBS Global Operations' CEO. In late 2021, Mr. Nogueira was promoted by JBS S.A. to be one of its two Global Presidents of Operation. He reports to JBS S.A.'s Global CEO, Gilberto Tomazoni.

71.     Operating Defendants Swift and Packerland are fully integrated into the JBS USA enterprise. They rest under the complete control of JBS USA, and in turn, JBS S.A. JBS USA directs and oversees all JBS's U.S. cattle procurement, beef processing, and sales operations, with ultimate direction from JBS S.A. JBS USA's financial statements are replete with references to notes, loans, and credit facilities that "are guaranteed by our Parent, JBS S.A."

72.     The career progression of Wesley Batista Filho clearly demonstrates the level of control JBS S.A. maintains over its subsidiaries, as JBS S.A. installed Wesley Batista Filho into whatever subsidiary they wished, at whatever level they wished, whenever they wished. Wesley Batista Filho is the son of former JBS S.A. CEO Wesley Batista, and the grandson of founder Jose Batista Sabrinho. His grooming to become the next Batista to lead JBS S.A. began with a position as a trainee in the JBS USA beef plant in Greeley, Colorado. He then returned to Brazil, where he

worked for JBS S.A. in a variety of roles. Soon after, he became Head of JBS Uruguay, and then Head of JBS Paraguay. He was next installed as Head of JBS Canada. After that, he was made Head of Fed Beef for JBS USA and President of JBS USA and Swift Beef. Then, he was promoted to president of all JBS operations in South America. Most recently, he was appointed by JBS S.A. as one of its two Global Presidents of Operations, along with Mr. Nogueira, and also reports to JBS S.A.'s Global CEO, Gilberto Tomazoni.

73.     Swift and JBS Packerland's packing operations are presented as those of JBS USA. For example, they appear on USDA's list of Bonded Packers as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.," respectively. The USDA's Food Safety and Inspection Service's Inspection Directory lists "JBS," "JBS USA," and "JBS USA Food Company," among other DBAs for Swift.

74.     JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations demonstrates these entities' unity of purpose (i.e., to profit from their price-fixing) and common objectives. JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. JBS S.A. does more than provide long-term strategy and guidance to JBS USA, Swift, and Packerland. The entire purpose of these subsidiaries is to serve as instrumentalities by executing JBS S.A.'s directives within the greater JBS enterprise. Throughout the Conspiracy Period, JBS S.A. exerted, and had the right to exert, total control over JBS USA, Swift, and Packerland. In this manner, JBS S.A. independently participated in the illegal enterprise with JBS USA, Swift, and Packerland and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with JBS USA, Swift, and Packerland as a single enterprise.

### (iii)    The Tyson Defendants

75.    Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries. Rather, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods would have otherwise conducted. With respect to Tyson Foods' subsidiary Tyson Fresh, those activities include purchasing and processing cattle and selling beef.

76.    Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh as a mere "business unit." Indeed, before Noel White became Tyson Foods' CEO (now former CEO), he was "group president of Tyson's Fresh Meats business unit."

77.    On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh when discussing the company's financial performance. On these calls, Tyson Foods announces operating income and returns on sales from its beef segment business that Tyson Fresh operates. More specifically, on these calls Tyson Foods attributes improved returns to actions taken at plants that Tyson Fresh owns and operates.

78.    During a January 31, 2014, earnings call, Tyson Foods management employees explained to investors that Tyson Foods had generated $58 million in operating income and a 1.6% return on sales from its beef segment business, despite that business being operated directly by Tyson Fresh Meats. On the same call, Tyson Foods' managers stated that "as the calf crop declines . . . we'll probably have to curtail production." Production of beef from the calf crop is an activity undertaken by Tyson Fresh.

79.    On other earning calls, Tyson Foods has described actions taken by Tyson Fresh to advance Defendants' conspiracy. For example, on its August 3, 2015, earnings call, Tyson Foods explained its strategy for cattle purchasing implemented by Tyson Fresh as "we run for margin

and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

80.    Similarly, on Tyson Foods' May 7, 2018, earnings call, with respect to beef production plants owned and operated by Tyson Fresh, Tyson Foods explained that "we have to stop production, we have closed plants, several times in the quarter, not every plant, but several plants in the quarter."

81.    Tyson Foods and Tyson Fresh also guarantee each other's debts. Tyson Fresh has issued multiple debt securities guaranteed by Tyson Foods. In a registration statement filed with the U.S. Securities and Exchange Commission ("SEC") in 2009, Tyson Foods notified investors that Tyson Fresh pledged not only its own assets to guarantee debt instruments but also those of Tyson Foods and certain "other domestic operating subsidiaries of Tyson [Foods]."

82.    Similarly, in a 2014 prospectus filed with the SEC, Tyson Foods stated that Tyson Fresh would act as a guarantor to Tyson Foods' debt securities, including debentures, notes, and all other types of debt. Tyson Foods has issued multiple senior notes under this arrangement.

83.    Finally, in registrations with the USDA's Food Safety Inspection Service, Tyson Fresh slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, and Amarillo, Texas, identify Tyson Foods as a business name of Tyson Fresh.

84.    Tyson Foods' extensive involvement in Tyson Fresh's management and operations demonstrates these entities' unity of purpose (i.e., to profit from their price fixing) and common objectives. Tyson Foods' extensive involvement in Tyson Fresh's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. Tyson Foods does not merely provide long-term strategy and guidance to Tyson Fresh. Tyson Fresh's entire purpose is to execute Tyson Foods' directives within the greater Tyson

enterprise and to serve as an instrumentality of Tyson Foods. Throughout the Conspiracy Period, Tyson Foods exerted, and had the right to exert, control over Tyson Fresh. In this manner, Tyson Foods independently participated in the illegal enterprise with Tyson Fresh and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with Tyson Fresh as a single enterprise.

### E.     Defendants' Co-Conspirators

85.     Unknown persons, firms, and corporations not named as Defendants participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether Plaintiff has named these co-conspirators as Defendants.

### F.     Reciprocal Agency of Defendants and Co-Conspirators

86.     Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

87.     Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiff alleges.

## IV.     FACTUAL ALLEGATIONS

### A.     Industry Background

88.     The market for fed cattle in the United States is enormous. For example, in 2017 alone, 25.8 million fed cattle were slaughtered and processed into beef products. This amount accounted for 80% of the 32.2 million commercial cattle slaughtered across the United States.[6]

---

[6] The remaining volume is comprised of slaughter cows (female cattle that have birthed a calf) and

89.    The cattle production cycle, running from birth to slaughter, typically ranges from 15 to 24 months, and is the longest of all animals typically raised for meat.

90.    Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 6 below.

**Figure 6.**



Source: GAO analysis of U.S. Department of Agriculture and industry information. | GAO-18-296

91.    Production of cattle raised for beef takes considerable time and investment. The life cycle of cattle raised for beef is longer than that of any other animal commonly raised for meat. As Figure 6 illustrates, the beef value chain comprises several stages. First, calves are raised by

bulls, whose meat is typically used for lesser quality beef products such as hamburger patties.

their mothers for six to ten months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector, where they eat a diet of forage, wheat pasture, and silage. When a steer or heifer reaches 600–800 pounds, it is sold to a feedlot where it eats corn and protein supplements in addition to roughage.

92.     Once cattle reach 950–1,300 pounds, they are sold as fed cattle to the beef-packing stage.  Defendants and other beef producers then slaughter and process the cattle into edible boxed beef and smaller case-ready consumer cuts. A steer weighing 1,000 pounds typically yields about 450 pounds of edible beef.

93.     Cattle are sold to beef processors through two channels. About 70 percent of cattle are sold through supply contracts (known as captive-cattle agreements) with feedlots or, to a lesser extent, ranching operations. The rest of the cattle are sold on the spot market, which is typically the benchmark for prices under the captive-cattle agreements. Because Defendants and other beef producers ordinarily have a steady supply of cattle through captive-cattle agreements, they are not forced to buy in the spot market. This affords Defendants the power to suppress the price of captive cattle and cattle purchased in the spot market.

94.     Finally, Defendants and other meatpackers sell the beef to businesses like Plaintiff, who distribute the beef to retailers, grocery chains and restaurants.

95.     Tyson Fresh, JBS USA/Swift/Packerland, CMS, and National Beef each conduct daily meetings, typically from their head office, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations. Among other matters, the attendees of these meetings will discuss the number of cattle their fed cattle business

will procure, the terms on which they will be bought, plant scheduling (including slaughter rates) across each of their slaughter facilities, and beef sales strategy.

96.    As the cost of fed cattle constitutes the majority of their costs of production, Operating Defendants' profitability is driven by the "meat margin," which is the spread between the price that packers pay for fed cattle and the price that they charge for beef. The meat margin is very sensitive to changes in industry aggregate slaughter levels, and which Tyson Fresh, Swift/Packerland, CMS, and National Beef can increase through cooperation. As noted by the DOJ, "[a]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. [B]ecause the supply of fed cattle and demand for [beef] are relatively insensitive to short term changes in price, even small changes in industry production levels can significantly affect packer profits."[7] As a result of these sensitivities, Tyson Fresh, Swift, Packerland, CMS, and National Beef on behalf of their parent companies, Tyson Foods, JBS S.A., JBS USA, and Cargill Inc., can improve their profitability by coordinating their respective slaughter levels at or below the prevailing supply of slaughter-weight fed cattle.

**B.    Operating Defendants' Agreement to Cut Production**

97.    By the beginning of 2015, Operating Defendants were forced to confront shrinking profit margins for their beef sales. The earnings calls of the two largest Defendants, Tyson Foods and JBS S.A., reported the slumping profitability of their beef operations.

98.    On a November 7, 2014, earnings call, Tyson Foods reported a quarterly operating margin for its beef division that was less than half the margin enjoyed by its poultry division.

---

[7] *U.S. v. JBS*, Case No. 08-cv-5992 (N.D. Ill.), ECF No. 48 ("Amended Complaint"), ¶¶ 26-27. *See also* Section A and G. (iii) below regarding the elasticities of fed cattle and beef.

99.     On a November 13, 2014, earnings call, JBS S.A. announced a badly underperforming beef segment at JBS USA. Its quarterly margin for its beef segment was not even half the poultry segment's margin.

100.     But rather than act independently in their individual business interests to restore profitability, Operating Defendants agreed to collectively reduce cattle purchases and slaughter volumes, causing a reduced supply of beef in the downstream market, including to direct purchasers.

101.     The consequent beef shortage ushered in a new era of supracompetitive prices paid by Plaintiff and other direct purchasers.

C.     **Direct Evidence of Defendants' Agreement**

102.     As confirmed by Witness 1, based on conversations with James Hooker, head of fabrication at Swift's Cactus plant, each of the Operating Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes, resulting in wholesale prices above competitive levels.

103.     Witness 1 is a former employee of Swift. He worked for Swift as a quality assurance officer ("QA") at Swift's Cactus, Texas slaughter plant. He worked there for over ten years until his employment ceased in early 2018.

104.     During the period of his employment coinciding with the Conspiracy Period, Witness 1 was a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, i.e., head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

105.    Witness 1 learned of Operating Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker, the head of fabrication at Swift's Cactus plant.

106.    Witness 1 regularly stopped by Mr. Hooker's office before starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days. These numbers affected how Witness 1 and his team would execute their responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would need to process through the hotbox and coolers that day, and his interactions with USDA inspectors.

107.    In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. Among other matters, if the kill volume was lower but the price of beef remained favorable, the fabrication floor would continue to process carcasses at typical rates. However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker may order the carcasses to spend longer in the hot boxes and coolers before being fabricated into beef cuts so as to improve grading performance. In this circumstance, Witness 1 and his team would allow more space between each carcass in the hotboxes. If the kill volume was higher, Mr. Hooker may need to increase the number of carcasses fabricated to ensure there was sufficient space in the hotboxes and coolers, and Witness 1 would need to space the carcasses closer together when filling the hotboxes. Further, the number of carcasses expected to be put into the hotboxes would dictate the amount of air and water Witness 1 and his team used to ensure proper cooling speeds. In sum, it was essential to both Mr. Hooker and Witness 1 that they know the plant's planned slaughter figures in order to perform their core job duties.

108.    Witness 1 reports having had a "decent" working relationship with Mr. Hooker.

### (i) Mr. Hooker Was Well Positioned to Know About Operating Defendants' Agreement

109. Plaintiff understands that Mr. Hooker continues to work at Swift's Cactus plant, where he has worked for over 15 years in that role, including a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for fabrication.

110. As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero,[8] and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

111. As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. He thus interacted with personnel across JBS USA/Swift/Packerland. In particular, in addition to his direct reports, Mr. Hooker would also speak directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

112. For example, Mr. Hooker would speak directly to Mr. Sergio Sampaio Nogueira, Head of Operations and Executive Vice President of Plant Operations for JBS's Fed Beef Business during the Conspiracy Period, when Mr. Nogueira visited the Cactus plant, which occurred regularly. Witness 1 understands that Mr. Hooker would also speak to Mr. Nogueira at other times. Mr. Hooker's contact with senior management reflects that JBS USA/Swift/Packerland senior executives maintained direct connections with plant-level managers, like Mr. Hooker, during the Conspiracy Period. Mr. Nogueira was installed by Wesley Batista, JBS S.A.'s CEO,[9] and was

---

[8] Mr. Guerrero worked for CMS for approximately 17 years prior to his move to JBS's Cactus Plant. He was Plant Manager for CMS's Fresno, CA plant prior to his departure in early 2012.

[9] Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and

regarded as Mr. Batista's "right hand man" in regard to JBS's U.S. beef operations. Mr. Nogueria had primary responsibility for Swift's fed cattle plant scheduling and/or operations during the Conspiracy Period.

113.    In addition, Mr. Hooker was responsible for the Cactus plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations at Cactus. When acting as the Cactus plant's General Manager, Mr. Hooker would liaise closely with fed beef executives from across JBS's head office.

114.    Therefore, Mr. Hooker spoke regularly with individuals very highly placed at JBS. Indeed, the following recent photo shows the close working relationship he had with such management:[10]

---

his brother Joesley Batista took control of JBS S.A. in the early 2000s, prior to JBS' acquisition of Swift and Pilgrim's Pride. Wesley was CEO of JBS S.A., directed JBS' takeover of Swift. He remained in that role, and as a director and senior executive of JBS USA, Swift, and Packerland. until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was ousted as CEO and spent time in prison.

[10] From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada - Cactus Technical Services Manager; Al Almanza - JBS Global Food Safety Director; Sergio Sampaio - JBS Corporate Director of Operations; Paul Kieker - FSIS Undersecretary USDA Operations; Dr. Hafeez - Texas USDA FLS; Dr. Mindy Brashears - FSIS Undersecretary USDA FS; Brian McFarlane - JBS Corporate Director of Technical Services; Mark DeRaad - Cactus Value Added Manager; Ryan Wagnon - JBS Slaughter Operations Manager.



115.    Mr. Hooker, Mr. Nogueria, and Mr. Wagnon, are respectively pictured on the far left, fourth from the left, and far right.

116.    In addition to having corporate information for JBS, Mr. Hooker had information regarding the other Operating Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo plant, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Operating Defendants' plants. Mr. Hooker would often provide Witness 1 with detailed information as to the current and future operations of Tyson Fresh, CMS, and National Beef's nearby packing plants.

### (ii)    Witness 1 Learns of an Agreement among Defendants

117.    Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all of the Operating Defendants reduced their purchase and slaughter volume in order to reduce fed cattle prices when Operating Defendants viewed fed cattle prices as

being or becoming "too high" for their liking. During one such conversation, Mr. Hooker specifically admitted that the Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

118.    That conversation occurred in 2015. Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor, who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado.

119.    After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift, Cactus] cutting [i.e., fabricating]?" Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[11]

120.    Witness 1 recalls asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill. Witness 1 reports he recalls that Mr. Hooker answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

121.    Witness 1 is certain that Mr. Hooker intended to convey that all Operating Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Operating Defendants had independently decided to do so.

122.    Witness 1 stated that Swift's Cactus plant had a 5,500–6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800–5,200 head per day when implementing Defendants' agreement. When Swift implemented the Defendants' agreement by

---

[11] Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

buying and slaughtering fewer cattle, consequences included running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns. Witness 1 recalls management at Swift's Cactus plant, including Mr. Guerrero and Mr. Wagnon, telling staff during these periods of reduced slaughter during the Conspiracy Period that kill levels were being reduced in response to fed cattle prices.

123.    Meanwhile, Defendants coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting supply, as further described below.

### D.    The Available Data Corroborates Witness 1's Account

124.    Public reports, Defendants' slaughter data, and the cattle sales data, indicate that all Operating Defendants reduced and rationed their slaughter volumes during the Conspiracy Period, resulting in supracompetitive beef prices. Operating Defendants also managed their respective slaughter volumes throughout the Conspiracy Period in relative lockstep in order to ensure the supply of beef remained lower than the increasing demand. Operating Defendants did so despite cattle being readily available and as Operating Defendants' margins ballooned.

125.    The slaughter reductions, while most obvious at the beginning of each year, occurred at various points throughout the Conspiracy Period. In particular, Operating Defendants moderated their slaughter volume across the second and third quarters of most years in a successful attempt to expand their margins, across a number of months, thereby also forestalling both the onset, and minimizing the effect of, the increase in slaughter volume that historically occurs in the fall.

126.    Operating Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off

36

the charts."[12] (*See* also Figure 11 below, demonstrating rising beef demand throughout the Conspiracy Period.) Nor did any Operating Defendant break from the agreement and buy more cattle in an attempt to capture greater market share, despite all posting profit margins clearly demonstrating that no Operating Defendant was running at or near their marginal cost of production. From the end of the first quarter of 2015 through the end of the Conspiracy Period, Operating Defendants posted record per head net margins. Even excluding 2019 and 2020, which saw Operating Defendants' margins skyrocket in the aftermath of the Holcomb plant fire and COVID disruption (discussed below), Operating Defendants' average per head margins across the Conspiracy Period for the first, second, third and fourth quarters vastly exceeded their pre-Conspiracy Period averages ($37 v. $0, $127 v. $21, $134 v. $25, $116 v. -$16, respectively).[13]

127.    Operating Defendants' rationing of the fed cattle supply amongst themselves in parallel throughout the Conspiracy Period is demonstrated through Figure 1 below, which records each Operating Defendant's estimated quarterly slaughter volume:

---

[12] *Tyson Fresh Meats: What the Consumer Demands* - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.
[13] Per-head net margin estimates cited in the Complaint are sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com unless stated otherwise. Pre-conspiracy period average per head margins are calculated across 1997 to 2014.

**Figure 1. Operating Defendants' Quarterly Fed Cattle Laughter Volume** [14]



128.    Figure 1 demonstrates that Tyson Fresh, Swift/Packerland, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These artificial reductions worked to cause the dramatic decline in fed cattle prices starting in 2015 and continuing throughout the Conspiracy Period, while beef prices were stabilized or increased.

---

[14] Tyson, JBS, and National's beef slaughter volume figures in Figure 1, were derived from Packing Defendants' (in the case of National Beef, its shareholders') financial disclosures and Cattle Buyers Weekly's record of each Defendant's fed cattle and non-fed cattle slaughter ratio to isolate the portion of their reported quarterly revenue figures attributed to beef and by-products produced from fed cattle slaughtered within the United States. Then, the volume of fed cattle (and beef) necessary to generate the disclosed revenue was determined, taking into account prevailing beef and by-product prices (as reported by USDA AMS boxed beef cutout reports and USDA drop-credit values), carcass weights, carcass grading performance (by region), and hot carcass/dressing percentages. Cargill's quarterly slaughter figures were derived by reference to Cargill's market share over time.

129.    And while the quarterly reporting period obscures certain shorter reductions described below in Sections IV. D (i)-(iv), it does detail the remarkable extent to which Operating Defendants' quarter-to-quarter slaughter changes moved in lockstep with each other. This parallelism is consistent with and the product of an agreement to jointly manage and reduce their slaughter levels below a competitive level.

130.    Figure 1 highlights the parallel reductions made by Operating Defendants in the winter/spring to constrain the seasonal rise in fed cattle prices historically experienced at this time, which had the effect of raising beef prices to a supra-competitive level. Tyson Fresh, Swift/Packerland, CMS, and National Beef each cut production at a similar time and by a similar amount:

- Q1 2015 (except Cargill whose production was flat after making significant cuts in 2014)

- Q1 2016

- Q1 2017

- Q1 2018

- Q4 2019 and Q1 2020

131.    This uniform reduction during periods of seasonally lower cattle availability is not evident in the pre-Conspiracy Period.  For example, in the fourth quarter of 2012, both CMS and Swift/Packerland significantly increased their slaughter volumes (3.8% and 12.1%, respectively on a quarter-on-quarter basis), while Tyson's held its steady (0.2% increase), and National Beef engaged in notable cuts (-3.9% decline). Similarly, in Q3 2013, Tyson Fresh and National Beef increased their slaughter volumes, while Swift/Packerland and CMS reduced theirs. Across Q2 to Q4 2014, Swift/Packerland evidently sought to capture market share, substantially increasing its

slaughter volume in the second quarter (16% increase against other Defendants' increases of between 4.5% and 10%) before holding it steady across the third and fourth quarters, while each other Defendant's volumes declined in those two quarters.

132.    What is not apparent from Figure 1 is the deep nature of the cuts in 2015 and 2016 when comparing the corresponding quarter to historical production (2012-2014). In 2015, the production decreased in the year overall and each quarter. For 2016, the production decreased overall and for three of four quarters. Tyson Fresh, Swift/Packerland, CMS, and National Beef's production was down comparing year-on-year changes against an average of 2012-2014 as seen in Figure 7:

**Figure 7.**

| Year on Year Changes Against 2012 - 2014 Averages | | | | |
|---|---|---|---|---|
| Comparison | Tyson Fresh | National | Swift/Packerland | CMS |
| 2015 v 2012-14 | -4.8% | -13.5% | -17.9% | -11.5% |
| Q1 | -5.1% | -15.3% | -20.1% | -12.7% |
| Q2 | -7.6% | -14.7% | -17.7% | -12.7% |
| Q3 | -0.7% | -15.1% | -16.9% | -9.7% |
| Q4 | -5.8% | -8.7% | -17.1% | -10.8% |
| 2016 v 2012-14 | -2.8% | -4.4% | -14.8% | -3.7% |
| Q1 | -4.5% | -14.9% | -21.7% | -9.3% |
| Q2 | -3.7% | -9.1% | -17.9% | -6.2% |
| Q3 | -5.2% | -3.9% | -10.1% | -2.7% |
| Q4 | 2.3% | 10.9% | -10.2% | 3.3% |

133.    Operating Defendants' strategy was immediately successful, with lower slaughter volumes and lower beef output resulting in artificially high beef prices, despite cash cattle prices falling. Operating Defendants' meat margin expanded rapidly as a result.

134.    Moreover, each Operating Defendants' conduct stands apart from Independent Packers' who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

135.    And, though Operating Defendants gradually increased their slaughter volumes over the rest of the Conspiracy Period, their rates of increase lagged far behind those of other producers, as evinced by Figure 2:

**Figure 2.**
**Average Annual Commercial Slaughter of Cattle**



136.    Figure 3 compares the annual slaughter volumes of Operating Defendants and smaller producers before and during the Conspiracy Period and breaks out these volumes for each year of the Conspiracy Period for which data is available.  In every year, Operating Defendants slaughtered fewer cattle than they did before the Conspiracy Period. Also shown is that, though Operating Defendants gradually increased their slaughter volumes year over year during the Conspiracy Period, their rates of increase lagged far behind other producers' rates.

**Figure 3.**
**Average Pre-Conspiracy and Conspiracy Period Fed Cattle Slaughter -**
**Operating Defendants vs. Others[15]**



137.    As shown in Figures 2 and 3 above, each Operating Defendant slaughtered significantly less cattle in 2015 than their pre-conspiracy period average, and then maintained artificially low slaughter levels throughout the remainder of the Conspiracy Period. That Operating Defendants each slowly raised their slaughter levels as the availability of fed cattle increased during the Conspiracy Period only reinforces the likelihood of a collective agreement to manage slaughter levels after their initial cut. Fully five years later, none of the Operating Defendants have returned to their pre-2015 levels despite record profitability, while Independent Packers slaughter is up nearly 25% against their pre-Conspiracy Period average, and 20% against their 2015 levels. The result of such action gave Operating Defendants the ability to manage collective demand such that it never outpaced supply, and ensured the supply of beef stayed below demand.

---

[15] *Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports*, 2008-2019, http://www.cattlebuyersweekly.com/users/rankings/index.php; *2018 Meat & Poultry Facts,* 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11. National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition its 2019 slaughter volume was flat as against 2018, while Independent Packers' collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium disposal).

E.     **Defendants Effectuate Their Agreement to Reduce Supply and Raise Prices**

(i)     **Defendants Slash Production in 2015**

138.    The impact of the conspiracy was sudden and dramatic in 2015, evidenced by publicly available data.  Each Operating Defendant cut its annual cattle slaughter volumes during the Conspiracy Period by an average of about 13 percent. In sharp contrast, other meatpackers increased their cumulative annual slaughter volumes during the same period by an average of 28 percent.

139.    Data breaking out slaughter volumes for each year of the Conspiracy Period highlight Operating Defendants' extreme reductions in 2015, though other beef producers maintained or increased their volumes that same year. Despite a slight uptick in the final quarter of 2015, Tyson Fresh's overall 2015 slaughter volume was down by 4 percent as compared with 2014 levels, Swift/Packerland by 17 percent, and National Beef by 6 percent. CMS's 2015 production was flat compared with the prior year but 11.3% below historical levels. All of this occurred during a sustained recovery in the broader economy, as the U.S. population grew steadily, and beef demand was high.

140.    In the first quarter of 2015, Tyson Fresh, Swift/Packerland, and National Beef's year-on-year slaughter was down by approximately -1.8%, -11.2%, and -8.6%, respectively. CMS's quarterly slaughter volume was down against a 2012-2014 average and its first quarter 2015 slaughter volume, like its co-conspirators, was still down on its fourth quarter 2014 volume.

141.    These declines were reflected in the Defendants' public reporting. Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015, year-on-year] due  to a reduction in live cattle  processed."  Jefferies, National Beef's then majority shareholder, noted in its 10-Q, filed May 8, 2015, that National Beef's revenues were down year-

on-year for the first quarter "primarily to lower sales volume, as fewer cattle were processed."[16] JBS S.A.'s earnings presentation for the first quarter noted a 1.1% year-on-year decline in the "number of animals processed" by its JBS USA beef unit.[17]

142. Expanding on their cuts, Tyson Fresh, Swift/Packerland, CMS, and National Beef extended their joint slaughter reduction during the second and into the third quarters of 2015. Across the second quarter, Tyson Fresh, Swift/Packerland, and National Beef's year-on-year slaughter was down by approximately -5.4%, -12.8%, and -6.2%, respectively. CMS continued to hold to its low 2014 volume, posting an essentially flat year-on-year growth of 1.8% in the second quarter, and -12.7% against its 2012-2014 average second quarter production.

143. Again, this reduction in cattle purchases was also reflected in Tyson Foods,[18] JBS S.A.,[19] and Jefferies (National Beef's)[20] financial reporting.

144. Operating Defendants' determination to break cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry

---

[16] Jefferies 10-Q, May 8, 2015 at 57, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10683755.

[17] JBS S.A., 1Q 2015 Results, May 13, 2015 at 15, https://sec.report/otc/financial-report/141980. JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations. Presentation also noted a -1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses. JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the conspiracy period was 80% fed, 20% non-fed.

[18] Tyson's 10-Q for its quarter ending June 27, 2015 recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed". *See* Tyson Foods 10-Q filed August 2, 2015, p. 38. *See also* 10-K filed November 23, 2015, p. 29 noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing.

[19] JBS S.A., 2Q 2015 Results, August 13, 2015 at 15, https://sec.report/otc/financial-report/143296 (noting - 0.9% decline year over year in cattle processing (both fed and non- fed) across its US, Australian and Canadian beef businesses).

[20] Jefferies 10-Q, August 5, 2015 at 52, http://d18rn0p25nwr6d.cloudfront.net/CIK-0000096223/6f776d2a- f247-4868-a18b-32f9e3b4eefe.html (noting revenues for three and six month 2015 periods decreased year-on-year "due primarily to lower sales volume, as fewer cattle were processed"); Jefferies 10-Q, November 5, 2015 at 53 (noting the same in relation to 3Q 2015 and the first three quarters of 2015).

analysts at the time. On June 11, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson Fresh Meats, speculated as to when one of the Operating Defendants might break ranks:

> Rarely has this industry segment [the beef packers] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring?  Will one short a customer only to find that order filled by a competitor?[21]

145.    Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [i.e., sold] in a timely fashion."[22]

146.    During the remainder of 2015, Operating Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up."[23] They did so even though under-utilizing their plants would hurt their margins.

147.    Tyson's CEO, Donnie Smith, admitted as much on August 3, 2015, when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the

---

[21] Cassandra Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.
[22] Cassandra Fish, *Another Round of the Blues*, THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.
[23] Cassandra Fish, *Kills Too Small For Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

long term." [24] In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity, Mr. Smith elaborated:

> In terms of quantifying the impact . . .we know when we're running 34s and 36s a week in our plants that that does cost us in - it raises the cost in our plant, makes us a lot less efficient. So it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.[25]

148.    Tyson Fresh, Swift/Packerland, CMS, and National Beef's concerted actions to depress cattle prices across 2015 (and their successes) are summarized by the below Figure 8, which compares the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[26] These figures are a very good proxy for Tyson Fresh, Swift/Packerland, CMS, and National Beef's cumulative slaughter volume as they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.[27] As demonstrated in Figure 8 below, the 2015 slaughter volumes are lower than 2014 in every month except February and November and lower than 2010- 2014 averages in every month except October.

---

[24] Tyson Foods, Q3 2015 Earnings Call, Seeking Alpha Transcript (Aug. 15, 2015).
[25] *Id.*
[26] Figure 8 was prepared using USDA Market News Service Reports: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly- Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated. Fed cattle prices shown in Figure 8 are the weighted average prices of all four purchase categories (formula, forward, negotiated (i.e., cash), negotiated grid).
[27] *See* Exhibit 1.

**Figure 8.**
**Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – all purchase types**



(ii)    **Operating Defendants Continued to Artificially Limit Supply into 2016.**

149.    By "ration[ing] their new purchases [of cattle]" and running shorter 32-hour weeks in early January 2016, Operating Defendants dampened rising cattle prices and extended the rally in beef prices.[28] Operating Defendants then further inflated beef prices by sustaining low kills across February and March.[29]

150.    Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in the first quarter of 2016: Tyson Fresh (-1.1%), CMS (-3.7%), Swift/Packerland (-16.6%), and National Beef (-4.7%). Moreover, all Operating Defendants slaughtered fewer

---

[28] Cassandra Fish, *Global Sell Off Smacks Cattle*, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.
[29] Cassandra Fish, *Yet More Consolidation*, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.

cattle than their average first quarter volume across 2012-2014: Tyson Fresh (-4.5%), Swift/Packerland (-5.3%), CMS (-9.3%), and National Beef (-14.8%).

151.    As a result, beef prices continued to skyrocket into March 2016, despite significantly lower than expected cattle prices. By rationing the available cattle amongst themselves, Operating Defendants posted average weekly margins of approximately $63 per head, which was, at that time, one of their "best Q1 in history" and well above their pre-Conspiracy Period first quarter average of $0 per head.[30]

152.    In the second and third quarters, each Operating Defendant's kill volume remained below their 2012 to 2014 averages.

153.    Despite an increase in the availability of fed cattle, except for Cargill, each Operating Defendant's annual slaughter volume in 2016 remained below their 2014 levels (Tyson Fresh (-6%) and Swift/Packerland (-6%)) or flat (National Beef).[31]   Cargill's 2016 slaughter remained significantly below the 2012-2014 average at -3.7%.

154.    Each Operating Defendant's refusal to break from their collective adherence to rationing the available cattle supply is all the more remarkable given the margins on offer to Operating Defendants across 2016. In the third and fourth quarters alone, Operating Defendants were realizing average per head margins on their fed cattle purchases of $123 and $153 per head. Not only were these margins significantly above pre-Conspiracy Period averages ($25 and -$16 per head), but they also exceeded the Operating Defendants' most profitable third and fourth quarters in modern times by about $30 and $100 per head, respectively. Operating Defendants therefore had both the incentive and the ability to buy and slaughter more cattle.

---

[30] Cassandra Fish, *Sell Off Accelerates*, THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/.
[31] *2018 Meat & Poultry Facts*, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11

### (iii)  After Historic Cuts, Operating Defendants Continued to Keep Supply Restrained, Resulting in Higher Beef Prices and in 2017 and 2018

155.    Going into 2017, Operating Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter weight cattle availability and beef demand. Tyson, Swift/Packerland, CMS, and National Beef each reduced their volumes in lockstep during the first quarter, before raising them together across the second quarter. *See* Figure 1.

156.    And while cattle prices did rise from $119/cwt at the beginning of February 2017 to a high of $144/cwt in the first week of May (similar to pre-Conspiracy Period spring highs), Operating Defendants responded by reducing their kills.

157.    As with 2016, Operating Defendants enjoyed substantial profits across 2017, posting then record per-head margins in the second and third quarters ($128 and $147 per head, respectively). Indeed, Operating Defendants' average per head margins for the first and fourth quarters, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016. And again, each Operating Defendant refused to add cattle to expand their market share despite the obvious profit potential. Instead, they kept their production in lockstep with one another, rationing supply amongst themselves to ensure the continued suppression of cattle prices and resulting increase in beef prices.

158.    Their scheme continued into 2018. Each Operating Defendant then began to tell the market that they had, as a result of the plant closures discussed, insufficient capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the spring and summer of 2018.[32]

---

[32]    Cassandra Fish, *Still Green!?!*, THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. The limitation perception is linked to labor. The perception of there being a limitation has created fear and inspired some cattle feeders to 'get in line' by selling [cattle] out-front [i.e., on captive supply agreements].").

159.    Operating Defendants then backed off their respective kill schedules during the first quarter of 2018.[33] *See* Figure 1, detailing significant decline in first quarter 2018 slaughter as against fourth quarter 2017. As Ms. Fish reported, "Looking back at March's fed slaughter rate, it underperformed expectations  Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable." The reduction in slaughter occurred despite record strong beef demand and Operating Defendants' under-utilized capacity.

160.    As a result of their commitment to rationing the available cattle amongst themselves, across 2017 and 2018 Tyson Fresh, Swift/Packerland, CMS, and National Beef's annual slaughter volumes remained 5.4-7.2%, 10.2%, 9.1% and 12.0-12.8% below their pre-Conspiracy Period averages, respectively. *See* Figure 7. By contrast Independent Packers slaughter volume across 2017 and 2018 were up 46.5% and 56.1%, respectively, on their collective pre-Conspiracy Period averages.

### (iv)    In 2019 and 2020, Operating Defendants Continued Parallel Slaughter, Which Was Against Each Defendant's Independent Self-Interest

161.    Going into 2019, beef demand remained "terrific," encouraging packers to run plants to meet customers' demand.[34] In ordinary times, absent a conspiracy, Operating Defendants would compete to secure as much cattle as possible to supply beef customers.

162.    Instead, Operating Defendants continued to work together to constrain and limit the advance in cattle prices that market conditions warranted. In the first quarter of 2019, each

---

[33] Cassandra Fish, *Futures Trade Both Sides; Cash Poised To Trade Lower*, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/.

[34] Cassandra Fish, *How About That*, THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

Operating Defendant reduced their slaughter volumes, posting similar quarter on-quarter declines: Tyson Fresh (-3.5%), National Beef (-4.0%), CMS (-3.8%), and Swift/Packerland (-4.1%). Operating Defendants each maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that their collective demand did not exceed the available supply. These supply restraints included taking downtime or reducing the number of hours the plant operates. Operating Defendants continued to constrain their weekly kill volume and decline to increase production of beef to meet rising demand, thereby artificially inflating the price of beef.[35]

163.    The resulting impact of Operating Defendants' slaughter restraint at the beginning of 2019 and their continued adherence to a common pricing strategy was that beef prices increased, despite the fact that prices for cattle continued to fall across the summer, working their way to an apparent bottom of about $109-110/cwt in the end of June. This left producers facing an average $106 per head loss, against Operating Defendants startling estimated per head profit of $257.[36]

164.    Despite robust beef demand, Defendants' restrained production left wholesale beef prices higher on a year-on-year basis, despite the fact fed cattle prices were flat. Ms. Fish reported beef prices were "sizzling" despite most cattle producers losing money.[37]

165.    A slight $2-3/cwt rise in prices allowed producers to realize a paltry per head profit of about $24 by the week ending August 9, 2019, against the Operating Defendants' profit of $192 per head.

---

[35] See, e.g., Cassandra Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.
[36] *Sterling Beef Profit Tracker: week ending June 21, 2019*, STERLING MARKETING INC. (June 26, 2019),https://www.drovers.com/news/industry/profit-tracker-feeding- losses-reach-triple-digit
[37] Cassandra Fish, *Packers Press and Cash Softens*, THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

166.     Notwithstanding the predicted cash cattle strength across August, a chance fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019 provided an opportunity for Operating Defendants to work cattle prices lower still, sending cattle producers back into the red. Tyson closed the Holcomb plant indefinitely in the aftermath of the fire.[38]

167.     However, following the plant fire, Tyson Fresh, Swift/Packerland, CMS, and National Beef all slashed their fed cattle bids and hiked their beef prices. These actions caused a $5/cwt drop in fed cattle prices and a $14/cwt rise in wholesale beef prices the following trading week.[39] This saw Operating Defendants' per head margins rise from $191 to $358 in the week ending August 16. The following week, Operating Defendants' margins continued to expand, with the spread between fed cattle prices and beef values extending to a then-record high of $67.17/cwt., $39.51/cwt above the average spread for the same week across 2016-2018.

168.     Defendants blamed the loss of Holcomb's 5,500-6,000 head per day slaughter capacity for these price changes. In a competitive market and with record profits, the other Operating Defendants would have wanted to increase their purchases of cattle and increase their slaughter numbers to both taken advantage of the high prices, and to take market share from the industry leader Tyson.

169.     Instead, in the month following the Holcomb fire, each Operating Defendant decreased its production. The parallel and coordinated decrease in production in the face of a large

---

[38] *Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire*, REUTERS (Aug. 11, 2019,1:30 PM), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson-foods-beef-plant-in- kansas-out-of-work-after-fire-idUSKCN1V10J1?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3 Amain_content%7Cbutton%3Abody_link.

[39] *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf. Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

supply restraint cannot be explained by legitimate reasons, but instead demonstrates the commitment by the Operating Defendants to maintain high margins and keep cattle slaughter restricted. Operating Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured that their collective supply remained constrained, giving the Operating Defendants the power to increase beef prices, while paying less for the cattle.

170.    Tyson Fresh, Swift/Packerland, CMS, and National Beef consequently reaped record high margins in the weeks that followed the Holcomb fire by stepping down fed cattle prices and raising beef prices in parallel. As cattle prices bottomed out in the week ending September 13, 2019, the spread between Operating Defendants and Cattle Ranchers per head margin exceeded $600, with packers making over $400 per head while producers sustained $200 per head losses.[40]

### (v)    Defendants Idled and Closed Plants, Refrained from Expanding Processing Capacity

171.    The conspiracy also entailed a longer-term strategy to restrict beef supplies.

172.    Operating Defendants agreed to permanently close processing facilities without replacing most of the lost capacity. These actions came on the heels of reduced production capacity already caused by a series of plant closures shortly before the Conspiracy Period, including these:

(i)    On January 17, 2013, Cargill Inc. announced it would shut down its Plainview, Texas, beef-processing facility, one of Cargill's larger plants, in just two weeks. This closure cut Cargill's slaughter capacity by 4,650 cattle per day, which was nearly 4% of the U.S. beef industry current capacity.[41]

---

[40] *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (September 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.
[41] *The Daily Livestock Report*, Vol. 11, No. 13 (Jan. 18, 2013), https://www.dailylivestockreport.com/documents/dlr%2001-18-13.pdf.

(ii)    In April 2013, JBS USA followed by acquiring an inactive plant in Nampa, Idaho, only to keep it idle. JBS stated that it had "no immediate plans to reopen the facility," which would have been capable of processing about 1,100 cattle per day, and, upon information and belief, it remains idle today.[42]

(iii)   In June 2014, National Beef closed its Brawley, California, plant. This eliminated another 2,000 cattle per day of slaughter capacity.[43]

(iv)    The next month, Cargill Inc. announced it would also close its Milwaukee, Wisconsin, plant on August 1, 2014. This closure decreased the industry's slaughter capacity by another 1,300 to 1,400 cattle per day.

(v)     Also in 2014, Tyson Foods shut down its Cherokee, Iowa, processing plant. Tyson Foods officials "told the city they would consider handing over the shuttered plant—but not to any firm that they believe is competition."[44]  In 2018, Tyson Foods allowed another company to purchase the plant but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."[45]

---

[42] JBS USA Acquires U.S. Operations of XL Foods, JBS April 4, 2013 Press Release, https://www.globenewswire.com/news-release/2013/04/04/536014/17532/en/JBS-USA-Acquires-U-S-Operations-of-XL-Foods.html.

[43] National Beef even rejected a significant package of incentives offered by local government utilities and nearby feedlots when it decided to close its Brawley plant. *National Beef plant closing Brawley Facility*, PROGRESSIVE CATTLEMEN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

[44] Available at https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/

[45] Available at https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.

173.    Operating Defendants continued to shrink the beef industry's processing capacity when the Conspiracy Period began. As an example, in August 2015, Tyson Food decreased the industry's slaughter capacity by another 2,000 cattle per day by shuttering its Denison, Iowa plant.

174.    As another example, on September 11, 2015, Cargill Inc. announced it would sell the Plainview, Texas, plant that it idled in February 2013.

175.    By idling these plants, Operating Defendants slashed the industry's annual slaughter capacity by some two million cattle per year—excluding JBS USA's continued idling of the Nampa, Idaho plant.

176.    While overall industry slaughter capacity increased slightly between 2015 and 2018, this nominal gain was primarily not the work of any Operating Defendant. Instead, it was attributable to other beef-processing companies. For example, One World Beef Packing restored about 2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2014.

177.    In sharp contrast to the Operating Defendants' behavior, these other beef processing companies acted consistent with their competitive interests by increasing their capacity and output in response to increased demand for beef, but their increased efforts to supply the downstream market with beef had little effect on the prices due to their nominal market share. Operating Defendants' market dominance and stranglehold on the industry meant that these minor incursions by the few remaining independent processors increased availability only in isolated pockets and had negligible effect on restoring supply (and thereby reducing beef prices) in most locations.

F.    **Operating Defendants Signaled Their Conspiracy and Encouraged Each Other to Maintain it**

178.    One method that Operating Defendants used to coordinate, promote, and monitor their conspiracy (evident now only with the benefit of hindsight afforded by the disclosure of other

55

now-apparent conspiratorial evidence) was to signal and discuss with each other their activities and plans during earnings calls. Examples of such communications include the following:

(i)      During a May 2014 earnings call, JBS S.A. offered this industry forecast: "For 2015, I think beef will keep being tight. I do not see any increase in the beef supply in 2015 in the U.S."

(ii)     During a May 2014 Q2 earnings call, Tyson Foods communicated that it was striving for margin and not market share: "For FY15, we expect fed cattle supply to be down 5% to 6% from last year, and we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our beef segment results should improve in the back half of the year, and while profitable for the year, FY15 results are expected to be below FY14. It is important to remember that *we'll continue to run our beef business for margin, not market share.*"

(iii)    On Tyson Foods's Q3 2015 earnings call, its CEO Donnie Smith admitted it was underutilizing its plants, despite hurting its margins. when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s." In response to a question

56

regarding the consequent impact of Tyson's underutilization of its plant capacity Mr. Smith elaborated: "In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have acost to us. I don't know that I can quantify that right off the bat, but it does impact margin."

(iv)     During Tyson Food's Q4 2015 earnings call, Mr. Smith further acknowledged thatthere was "relatively low cattle supply, you've got too much -- well, I should not say too much, *that's probably not the right way to say it* -- but you've got excess industry capacity and that limits our ability to drive margins above the 1.5% to 3%, we think." On its Q3 earnings call, JBS USA's CEO Andre Nogueira de Souza publicly praised Defendants' efforts to reduce industrywide slaughter capacity through plant closures, remarking that "the reduction that we saw in the cutbacks of production in U.S. that  was  withthe shutdown of nine plants the last two years reduced the cattle. (inaudible) cost us [$3.5 million].I think that will be a very good position balancing the industry in 2016, 2017 and 2018."

(v)     On a May 2016 JBS S.A. Q1 earnings call, JBS USA's CEO Mr. Nogueira de Souza described the company's supply strategy: "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing this side

because a lot of plant were shut but it's still way below our historical production level."

(vi)    On its November 2016, Q4 earnings call, Tyson Foods acknowledged the widening of the meat margin: "The dynamic is that livestock prices – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef and pork."

### (i)    Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions

179.    Operating Defendants procure their fed cattle in three ways: on the cash cattle trade market (the industry's version of the spot market), through formula or forward contracts, and, for Swift/Packerland and CMS, relying on their own cattle. Through these contracts, the producer agrees to deliver its cattle once they have reached slaughter weight at a price to be determined at the time of delivery.

180.    To increase their meat margin, Operating Defendants jointly managed their purchases of domestic fed cash cattle in parallel below the available supply, including by reducing the number and volume of purchases. Operating Defendants took advantage of the supply glut and lower cash cattle prices and increased their meat margin. Operating Defendants expanded their meat margin by refusing to pass-on the savings from the reduced cattle prices to purchasers of beef, which would normally happen in a competitive market. Instead, beef prices remained high while prices to cattle producers decreased, indicating a collusive agreement between Operating Defendants.

181.    In addition to Operating Defendants' reduced cash cattle purchases, each employed an antiquated "queuing convention" throughout the Conspiracy Period which served to limit producers' ability to generate price competition for their cattle.

182.     The convention, which operated predominately in relation to those cattle sold in the cash market, works as follows: once a producer receives a bid from a Packer, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers, i.e. require competition for the bidding process. If another Packer offers the same bid as the original bidding Packer, the producer must give the original Packer the right of first refusal.

183.     The obligation to give a right of first refusal without consideration was collectively imposed by Operating Defendants under threat of boycott. Operating Defendants have adhered to and enforced the convention for decades, including across the Conspiracy Period, and treat it as a mandatory industry custom.

184.     On former feedlot manager, Matt T. ("Witness 2"), confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation. In particular, each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

185.     Witness 2 further reports that, when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS. When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids. Witness 2 reports that the Tyson Fresh and Swift field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

186.     Witness 2 also heard from the Operating Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood that the Operating Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Operating Defendant's bid, or would ex-post pressure the producer for details of its sale.

187.     As evinced by the expanding meat margin, Operating Defendants collectively refused to pass-on any savings from the anticompetitive conduct toward the cattle producers to Plaintiff, instead keeping the ill-gotten gains for themselves.

### G.     Defendants' Conspiracy Increased the Spread Between Cattle and Beef Prices

188.     Droughts from 2011 through 2013 caused fed cattle prices to steadily increase. Predictably, wholesale prices of beef moved in tandem, maintaining a constant relationship (or margin) between the two. As a result, Operating Defendants' profits on average were trimmed to margins of only 1 to 3 percent.

189.     The DOJ has recognized that when the beef market is functioning competitively, a strong relationship exists between the supply of cattle and the price of beef charged to direct purchasers:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packerprofits.[46]

---

[46] *U.S. v. JBS,* Amended Complaint, ¶¶ 26-27.

190.    Thus, in a competitive market, lower wholesale beef prices naturally follow lower cattle prices. Once the conspiracy took hold, the spread between cattle and beef prices grew significantly. Operating Defendants' restriction of the beef supply caused cattle prices to slump, while Operating Defendants charged direct purchasers for beef at elevated prices that would not have existed in the market but for Operating Defendants' artificial supply restraints.

191.    Figure 4 is a graph constructed from published USDA data. It captures the steep climb of the spread during the Conspiracy Period, which began after a period of very minimal growth from 2012 to 2015:



**Figure 4.**

**The Spread Between the Farm Value of Beef and Wholesale Prices 2012 - 2020**

*Source: USDA*

**Figure 5.**

| Years | Farm to Wholesale Price Spread | Proportional Increase |
| --- | --- | --- |
| 2010 through 2014 | $34.07 | |
| 2015 through 2018 | $54.24 | 59% |
| 2019 | $84.15 | 55% |
| 2020 | $125.05 | 49% |
| | | |
| 2010 through 2014 | $34.07 | |
| 2015 through 2020 | $71.03 | 109% |

192.    According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to present than during the preceding five years. From 2010 to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54—a 59% increase. The spread continued to balloon, by 2020 reaching about $71, a 109% increase from the pre-conspiracy period average.

193.    Operating Defendants' ability to cut beef production while maintaining inflated beef prices during the Conspiracy Period provides compelling circumstantial evidence of their conspiracy. In a beef market free from collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase their market shares.

### H.    Tyson Foods and, Jointly, JBS S.A. and JBS USA Falsely Claimed Their Record Profits Were Due to Market Prescience, Not Supply Constraints

194.    Throughout 2017 and 2018, on earnings conference calls, executives from JBS S.A. and Tyson Foods frequently attributed their historically high profits to their ability to accurately foresee the volume of cattle that would enter the beef supply chain in the upcoming years. Examples of such boasts include the following:

> (i)    On a Q3 2017 earnings call on August 7, 2017, Tyson Foods reported a beef-business operating margin of 3.7 percent for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our beef business is well- positioned for profitable, long-term growth." Tyson acknowledged that it was considering raising its previously forecasted 1.5–

3 percent normalized operating margins. But despite ample supply of cattle and high demand for beef, Defendants did not increase cattle purchases or cattle slaughter.

(ii)     On a Q2 2018 earnings call on May 7, 2018, Tyson Foods announced forecasted beef operating margins of 6 percent for the year—at least twice its normalized operating margin range of 1.5– 3 percent. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our regions are exceptionally good."

(iii)     On JBS S.A.'s Q1 2018 earnings call on May 15, 2018, JBS S.A. reported an EBITDA margin of 6.1 percent for the quarter and forecasted that the company would enjoy recordbeef margins for the next two quarters. JBS USA's CEO and President Andre Nogueira emphasized that its performance was not based on "taking share from anyone."

(iv)     On a Q3 2018 earnings call on August 6, 2018, Tyson Foods reported a beef operating margin of 8 percent for the quarter. Tyson Foods stated that it had an "optimistic outlook" because "we have good visibility into 2021 . . . that's good because we do see the numberof animals that are out there."

(v)     On a Q2 2018 earnings call on August 15, 2019, JBS S.A. reported a beef EBITDA margin of 10.2 percent for the quarter. JBS USA's CEO and President Andre Noguiera stated thatit was "moving the overall margin in beef [to] a different level that was in the past." JBS added that it benefitted from shutting several plants in the previous five years, and that it could not

see how U.S. beef could "be less profitable in 2019 compare [sic] how it is going to perform in 2018."

(vi)     On a Q4 2018 earnings call on November 13, 2018, Tyson Foods reported record beef operating margins of 8.9 percent for the quarter and 6.7 percent for the fiscal year and statedthat it expected similar results in the following years thanks to visibility into cattle supply: "As welook at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

## I.     Additional Plus Factors Encouraging the Reasonable Inference of Defendants' Conspiracy

195.    The beef meatpacking industry bears all the characteristics of a highly cartelized market: (i) the beef market is highly concentrated; (ii) beef is a commodity product; (iii) inelastic demand; (iv) there are high barriers to entry in the beef-packing industry; (v) the industry presented multiple opportunities to collude; (vi) Defendants' reduced their imports; (vii) production and capacity cuts were made in the face of increased demand for beef; (viii) Defendants' market shares became more stable. These characteristics supported Operating Defendants' collusion to constrain the number of cattle entering the supply chain, reduce and restrain the volume of processed beef sold, raise and fix the wholesale price of beef, and maximize Operating Defendants' margins.

### (i)     The Beef Market is Highly Concentrated

196.    Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when only a few firms control a large share of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players.

197.    A high degree of Operating Defendants' control simplifies coordination because little outside competitive presence exists to undermine the cartel, and Operating Defendants can more easily monitor each other's actions related to supply and pricing.

198.    In a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might achieved by undercutting their cartel price.

199.    The beef industry experienced significant consolidation leading up to and during the Conspiracy Period. In 2001, Tyson Foods purchased IBP, Inc., then the nation's largest beef packer. In 2002, Cargill, Inc. purchased Taylor Packing Co. In 2007 and 2008, JBS USA acquired Swift & Co. and Smithfield Beef Group, Inc., the third- and fifth-largest U.S. beef packers.

200.    Following these purchases, Operating Defendants collectively controlled about 81–85 percent of the cattle slaughter market throughout the Conspiracy Period, while the next largest meatpacker had only a 2–3 percent market share. Operating Defendants' control of the market enabled the conspiracy to launch in 2015 and prosper ever since.

### (ii)    Beef is a Commodity Product

201.    A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

202.    Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content. The USDA recognizes beef as a commodity and posts daily beef prices. Options and futures for the cattle from which beef is produced are traded as commodities on the Chicago Mercantile Exchange.

203.    Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price as opposed to other attributes such as

product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

204.    Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be attributed to other factors such as special product features, quality, reliability and durability, or other terms of a transaction.

### (iii)    The Demand for Beef is Inelastic

205.    Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service. Demand is inelastic if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product.

206.    Under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and they continue to purchase despite a price increase.

207.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices; otherwise, increased prices would result in declining sales, revenues, and profits as customers purchase substitute products or decline to buy altogether.

208.    Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

209.    Beef demand is relatively insensitive to price changes. According to a recent study of beef demand, "[s]ince beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume purchased."[47]

---

[47] Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants*, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

210.    The same study concluded that the relative impact of pork and chicken prices on beef demand is economically small. Operating Defendants' supracompetitive prices to its direct purchasers do not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

### (iv)    The Beef Market has High Barriers to Entry

211.    Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and make it easier for incumbents to collude.

212.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supracompetitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

213.    Barriers to entry kept would-be competitors out of the beef-packing industry. The construction of a large packing plant requires an investment of at least $250 million. It normally takes two years or longer to obtain the necessary permits and plan, design, and build the facility. And new entrants must also comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.

214.    These barriers have caused new entrants to file for bankruptcy shortly after attempting to enter the market. These casualties include substantial enterprises such as Northern Beef Packers, LP, and Sam Kane Beef Processing, LLC.[48] Relative insulation from the threat of new competitors has enabled Operating Defendants to maintain their conspiracy.

---

[48] Northern Beef Packers LP filed under Chapter 11 in July 2013 and ceased operations before selling off its assets in December of that year. *Northern Beef Packers sold to White Oak for $44.3 million,* The National Provisioner, Dec. 9, 2013. Sam Kane Beef Processing filed under Chapter 11 in January 2019 and was acquired by STX Beef Co. in February. *Kane Beef plant sale closes,*

### (v)     Defendants Took Advantage of Multiple Opportunities to Collude

215.     Operating Defendants are members of industry trade associations and forums and regularly attend industry events, including the events listed below. These events provide opportunities to exchange pricing, supply, and other competitively sensitive information.

216.     For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon, which includes a summer conference, legislative conference, and regional meetings.[49] The NCBA Product Council, which includes Defendants'[50] representatives and representatives from other packers, meets quarterly for the invitation-only beef executive meetings. For example, two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement Bill Thoni and former Tyson SVP of Beef Margin Management and VP of Boxed Beef Pricing Kevin Hueser, were both officers, board members, or formally designated participants of the NCBA during the Conspiracy Periods. Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils, held contemporaneously with the NCBA summer and winter meetings.

217.     The U.S. Meat Export Federation ("USMEF") is another example of a trade association at which Defendants regularly met. The USMEF develops export opportunities for U.S. protein producers and holds both spring and fall conferences and monthly international trade shows[51] USMEF leadership includes current and former employees and officers of Defendants.

---

*new owner pledges to restart operations,* Daily Adviser, Mar. 1, 2019.

[49] NCBA Allied Industry Membership, NAT'L CATTLEMEN'S BEEF ASS'N (2019), https://convention.ncba.org/.

[50] In May 2021, it was reported that JBS had left the NCBA or at least suspended its membership sometime in 2020. Helena Bottemiller Evich, *Beef Lobby Rift: JBS Leaves NCBA,* POLITICO (May 21, 2021), https://www.politico.com/news/2021/05/21/beef-lobby-rift-jbs-leaves-ncba-490189.

[51] Events: Meetings, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; Events: Trade Show Calendar, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

For example, former CMS/Cargill Vice President of International Sales Pat Binger was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods SVP of International Sales Roel Andriessen served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods SVP of International Sales and VP International Sales Robert Shuey was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales Peter Michalski served on the Export Committee of the USMEF; and former National Beef NBP International Sales President Mark Domanski served on the Export Committee of the USMEF. Also, in November 2017, Tyson's Roel Andriessen and CMS's Pat Binger both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[52]

218.    Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members. Defendants participate in its annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

219.    Defendants also came together for multiple meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute. NAMI is a national trade association that represents companies that process 95% of red meat.[53] Executives and employees of Defendants also participated and held leadership positions in the NAMI. For example, CMS President of Business Operations & Supply Chain and former Cargill Beef President John Keating was an officer, board member, or formally designated participant of the NAMI; former Tyson Foods CEO, Group President of Fresh Meats

---

[52] USMEF Members Examine Challenges ahead, Elect New Officer Team, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.
[53] See About NAMI, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; Events, NAT'L AMERICAN MEAT ASS'N (2019),https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

& International, and COO Noel White served on the Executive Committee of the NAMI; former Tyson Foods CEO and President Thomas Hayes also served on the Executive Committee of the NAMI; National Beef President and CEO Timothy M. Klein served on the Executive Committee of the NAMI; and JBS USA CEO Andre Nogueira served on the Board of Directors of the NAMI.

220.    The NAMI and the Food Industry Association host an annual Meat Conference, which various executives and employees of Defendants attend every year.[54] In 2017, National Beef's Timothy Klein, Tyson Vice President of Boxed Beef Pricing Don Kieffer, JBS USA's Andre Nogueira, and CMS Vice President of Sales John Jay, amongst other Defendant executives, were listed as attendees of the Meat Conference.[55] In 2018, National Beef's Timothy Klein, JBS USA's Andre Nogueira, Cargill Vice President of Retail Beef Business Lead Elizabeth Gutschenritter, and Tyson's Don Kieffer attended the Meat Conference.[56] In 2019, JBS USA's Andre Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's Elizabeth Gutschenritter were listed as attendees.[57] In 2020, Tyson's Noel White and National Beef's Timothy Klein again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[58]

---

[54] *Meat Conference*, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited Dec. 9, 2020).
[55] *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020) https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=43A35D00000 DFE&sortBy=nam e
[56] *2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20AMC%20Attendee%20List. pdf
[57] *Meat Conference 2019 Attendee List (as of 2/27)*, MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.
[58] *2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=571D8100000 4FF&sortBy=comp any

221.    Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics such as economics and general business. That conference was then replaced by an annual Meat Industry Summit. This summit has sponsored "networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

222.    The beef industry's Annual Meat Conference, described on the event's website as "a complete education and networking experience," provides another opportunity for Defendants to confer. Many of Defendants' high-level executives have been attending this conference for years. The list of registered attendees in 2012, for example, included eight executives from JBS, Tyson Foods's then-CEO Donnie Smith, and twelve other Tyson executives.

223.    Defendants' executives and employees also attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for Risk Management Education and Research at Kansas State University, in 2018.[59] CMS' Bill Thoni and Tyson's Kevin Hueser were listed as attendees of the 2018 AgCon along with other Packing Defendants' executives and employees, including Tyson Fresh's VP of Sourcing & Risk Management Randall Chambers; Tyson Fresh's VP of Cattle Procurement John Gerber; National Beef Vice President of

---

[59] *Inaugural AgCon brings business, government together to discuss ag futures markets*, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/news/stories/2018/03/AgCon2018.html.

Cattle Procurement Chad Barker; National Beef Vice President of Procurement and Risk Management Phil Groetken; and JBS USA Head of Risk Management Marco Sampaio.[60]

224.     Tyson, JBS, and Cargill Defendant executives also had ample opportunities to meet privately particularly at the beginning of the conspiracy as a result of JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively. JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014 and closed on December 1, 2014 and June 29, 2015, respectively,[61] while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015. Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle such as then-Tyson CEO and President Donnie Smith,[62] JBS USA CEO Andre Nogueira,[63] and then-Cargill Senior Vice President Todd Hall[64] were all involved in the acquisition discussions. JBS S.A.'s CEO Wesley Batista stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations "started years ago," with discussions intensifying at the beginning of 2015, coinciding with the start of the Conspiracy Period.[65]

---

[60] *2018 AgCon Attendees,* KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_Mar30.pdf.

[61] JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

[62] *Tyson to sell Mexico, Brazil poultry businesses to JBS, REUTERS* (July 29, 2014, 1:32 PM), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

[63] *Lawrence Aylward, Inside the JBS, Cargill deal, MEAT + POULTRY* (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[64] Press Release, *Cargill, JBS USA Pork agrees to purchase Cargill Pork business* (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

[65] *Luciana Magalhaes, With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.,* WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508

225.    These events afford Defendants' top executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in an informal setting and monitor compliance with their conspiracy.

### (vi)    Defendants Exacerbated Their Supply Restraints by Continuing to Reduce Their Imports

226.    Defendants did not offset their slaughter reductions by importing more cattle into the United States. Rather, imports continued decreasing in 2015 and throughout the Conspiracy Period. Figure 9 captures this trend:

**Figure 9.**



Cattle Imports For Slaughter

Source: ERS calculations using data from U.S. Department of Commerce, Bureau of the Census.

227.     Furthermore, certain Defendants shuttered international plants, thereby decreasing the supply of cattle available to be imported into the United States, which could otherwise have offset Operating Defendants' conspiratorial reductions.

228.     Operating Defendants' reduced domestic slaughtering and reduced cattle imports for slaughter combined to raise above competitive levels beef prices paid by Plaintiff.

### (vii)     The Production Cuts Were Implemented Despite Surging Beef Demand

229.     Operating Defendants' joint slaughter management was not a reaction to changes in beef demand. Tyson Fresh's Head of Cattle Procurement, John Gerber, admitted at a November 2018 industry conference:

> "[The] [c]onsumer will pay more for beef, and have to pay more for beef because beef is worth more. There is value out there in chicken and pork, but unless you have been living underneath a great big rock the last two years, you know *beef demand is off the charts*. We have a lot of supply coming at us, but we have been able to hold the price at a pretty good level, because of beef demand, it's been really good, and I think it will stay good[66]

Yet, no Operating Defendant broke from their collective restraint and bought more cattle in an attempt to capture this "off the charts" demand for beef.

230.     By February 2019, beef demand was "terrific" and, in ordinary times, would encourage packers to compete to secure more cattle and run plants to meet customers' demand.[67]

---

[66] *Tyson Fresh Meats: What the Consumer Demands* - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[67] Cassandra Fish, *How About That*, THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

231.    This strong beef demand trend continued into the fall of 2019, where the "voraciousness of beef demand [surprised] pretty much everyone in the business."[68]

232.    As shown in Figure 11 below, beef demand rebounded from its low in 2013. Beef demand not only remained strong during the Conspiracy Period, but actually steadily increased from its prior lows in the immediate pre-collusion period, as is also evident from Figure 11 below.

**(viii)    Defendants' Market Share Stability is Indicative of a Conspiracy**

233.     In a competitive market, market shares fluctuate as producers compete for and gain business from each other. Stable market shares over time can suggest anticompetitive behavior like that engaged in by Operating Defendants.

234.    Although market-share stability in a commodity market does not itself prove collusion, it strongly suggests operation of an effective cartel that has agreed not to compete. A marked decline in market-share volatility over time may suggest a conspiracy in a previously competitive market.

235.    Available data show that Operating Defendants' market shares, measured by wholesale beef sales, became more stable during the Conspiracy Period. The same is true for Operating Defendants' market shares as measured by slaughter capacity.

236.    Operating Defendants did not do the things true competitors would do in a competitive market. They did not attempt to capture each other's market share or lower prices as their costs declined. Rather, they shared competitively sensitive confidential information.

237.    As described in Section IV. A-E, Operating Defendants reduced their output and capacity to produce beef for sale to Plaintiff. In a competitive market, the reduction in output by

---

[68] Cassandra Fish, *Packers Press and Cash Softens.* THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/

one producer typically presents an opportunity for competitors to capture market share in the face of constant or increasing demand.

238.    But instead, Operating Defendants reduced their output to limit beef supply, which increased beef prices. By acting together to advance their conspiracy, Operating Defendants sacrificed potential individual gains via increased market share for larger collective gains for all by increased prices and profit at the expense of Plaintiff. Figure 10 demonstrates Operating Defendants' overwhelming dominance of the market for the purchase of fed cattle.

**Figure 10.**
**Operating Defendants' Share of Annual Fed Cattle Slaughter Volumes**



**Figure 11. Monthly Beef Demand Indices, Jan. 1988 – Nov 2020**



**J.** **The Beef Industry Faces Governmental Inquiries and Investigations**

239.    Price fixing, concerted output restriction, and other anticompetitive conduct, especially in an industry as large, prominent, and vital to national well-being as food production, eventually attract governmental scrutiny. The nation's antitrust enforcers, along with politicians and other government regulators, have an interest in ending such practices.

240.    Over the past year, Defendants' market power and profiteering, made even more unattractive by the COVID-19 pandemic, has caught the attention of politicians and regulatory bodies. Investigations confirm the egregiousness of Defendants' conduct and suggest Defendants' culpability for their illegal acts.

241.    In August 2019, the USDA opened an investigation into the beef industry following a fire at Tyson's Holcomb, Kansas plant. The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while elevating beef prices.

242.    On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the DOJ urging the department to launch an investigation into price-fixing in the cattle market. The authors highlighted Defendants' harm to upstream producers and downstream consumers.

243.    On a conference call reported in the press, Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anti-competitive marketplace that unfairly disadvantages the cattle producer and the consumer." Senator Rounds further commented, "These margins just don't make any sense. The reality is there is an inverse correlation between the producer's price and the consumer's price."

244.    On April 8, 2020, Reuters reported that the USDA had extended its existing investigation to include a pricing dynamic like what was observed after the Holcomb fire—reduced prices paid to ranchers for cattle accompanied by a surge in retail beef prices—in the wake of announced production shortages associated with the nationwide COVID-19 outbreak.

245.    On April 17, 2020, state-level cattle production trade associations from 23 states signed a letter to Attorney General William Barr requesting the DOJ coordinate with the USDA and launch its own investigation into "fraudulent business practices within the meatpacking industry." Signatories included the Minnesota State Cattlemen's Association.

246.    The letter described the two extraordinary pricing episodes, identified by the USDA, following the Holcomb fire and during the COVID-19 outbreak. The state trade

associations not only reported their own plight but also observed that: "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices."

247.    With respect to the most recent manipulations, the letter explained that: "We are now seeing that same type of price action [observed after the Holcomb fire] repeated—only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system." Indeed, in the last analysis, Defendants' conduct portends more than mere profiteering. If left unchecked, it will remain a direct and gathering threat to the country's food security during the current crisis.

248.    On May 5, 2020, 11 state attorneys general representing agricultural heartland states, including the Minnesota attorney general, signed a joint letter to Attorney General Barr urging the DOJ to open a coordinated federal antitrust investigation into "anticompetitive practices by the meat packers in the cattle industry." This letter reiterated the two-way value extraction made possible by Defendants' market power: "Cattle ranchers . . . often struggle to survive. Consumers, moreover, do not realize the benefits from a competitive market."

249.    On June 4, 2020, Bloomberg reported that the DOJ had served civil investigative demands on Tyson Foods, JBS S.A., Cargill, Inc., and National Beef in connection with an investigation into antitrust violations consistent with the earlier requests by the producer trade associations and state attorneys general.

### K.    Defendants Fraudulently Concealed Their Conspiracy

250.    Throughout the Conspiracy Period, Defendants effectively, affirmatively, and fraudulently concealed the conspiracy from Plaintiff.

251.     Defendants used various means and methods to fraudulently conceal their conspiracy, including but not limited to secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply-restraint communications on documents, and communicating competitively sensitive data to each other.

252.     The facts alleged in Section IV. A-F of this complaint describe Defendants' secret behaviors intended to advance their conspiracy. These sections allege the who, what, when, where, and how of Defendants' conspiracy—based on behaviors known only to Defendants to be illegal at the time they performed them—that plausibly suggest Defendants engaged in a fraudulent-concealment campaign.

253.     JBS and Tyson often falsely attributed their historically high profits to their ability to accurately foresee the volume of cattle that would enter the beef supply chain in the upcoming years, yet their high profits had nothing to do with foresight and instead were the result of collusion, as described in Section IV. F of this complaint.

254.     Accordingly, Defendants concealed their illegal behavior from Plaintiff by the following means:

  A.     communicating privately by telephone about their purchases and slaughter volumes so they would not create written evidence of sharing this information, as well as relying on nonpublic forms of communication;
  B.     offering false or pretextual rationales for the low fed cattle prices;
  C.     providing pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;
  D.     explicitly and implicitly representing that the fed cattle bids and contract terms offered to Plaintiff were the product of honest competition and not a conspiracy;
  E.     misrepresenting that Defendants complied with applicable laws and regulations, including antitrust laws; and
  F.     misrepresenting the nature of Defendants' agreements (and purported adherence to competitive safeguards) to government officials and the public.

255.     During the Conspiracy Period, Defendants also lied about their compliance with antitrust laws whose compliance lies at the heart of Plaintiff's antitrust case: As it concerns Cargill, Inc.'s, JBS S.A.'s, and Tyson Foods's false or pretextual statements or issued false or pretextual data, Cargill, Inc. did so for the benefit of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh because, had these parent Defendants not continually cloaked Operating Defendants' conspiracy, the entire conspiracy would have been unable to operate. Indeed, these parent Defendants told and perpetuated many of the lies that fueled Operating Defendants' conspiracy and allowed it to operate.

  A. Tyson's Code of Conduct has touted that "[w]e compete in the market with integrity and comply with competition laws [and w]e comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

  B. JBS's 2014 Annual Report asserts that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical Conduct "that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

  C. Cargill stressed in its Corporate Responsibility reports that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built" and "We conduct our business with integrity . . . We compete vigorously, but do so fairly and ethically. [W]e ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

  D. National Beef's former majority shareholder, Jefferies Financial Group acknowledged in its 2014 Annual Report that National Beef was "subject to extensive government regulation," including the USDA's.

256.     As it concerns Cargill, Inc.'s, JBS S.A.'s, and Tyson Foods's false or pretextual statements or issued false or pretextual data, Cargill, Inc. did so for the benefit of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh because, had these parent Defendants not continually cloaked Operating Defendants' conspiracy, the entire conspiracy would have been unable to operate. Indeed, these

parent Defendants told and perpetuated many of the lies that fueled Operating Defendants' conspiracy and allowed it to operate.

257.    In addition to Defendants having affirmatively concealed their conspiracy, Defendants' conspiracy was inherently self-concealing because it depended on secrecy for its successful operation.

258.    Defendants also lied about their plant closures, slaughter reductions, and withdrawal from the cash cattle trade as follows:

#### (i)    The Cargill Defendants

259.    As discussed above, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance their conspiracy.

260.    To facilitate Defendants' conspiracy, Cargill, Inc. made public statements offering pretextual explanations to cloak Defendants' unlawful activity. For example, Cargill, Inc. used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef [produced] favorable market conditions in North America."

261.    The following year, Cargill, Inc. proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef" rather than through its price-fixing scheme, which reference Cargill, Inc. understandably avoided.

262.    Cargill, Inc. made these false public statements to obscure its role and participation in the conspiracy. Instead of disclosing that its "strong performance" stemmed from the illegal behavior and profits, Cargill, Inc. concocted fabricated business justifications such as "favorable market conditions" and "rising domestic and export demand."

### (ii) The JBS Defendants

263. As discussed above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

264. To facilitate the conspiracy, JBS USA made public statements to conceal Defendants' unlawful activity. For example, in November 2015, JBS USA CEO Andre Nogueira declared that "[c]attle price will go down" in the United States because "we are going to see more cattle available."

265. Similarly, in March 2016, JBS S.A.'s CEO Wesley Mendonca Batista, stated that JBS would see "better margin[s]" due to an "increase in the herd in the U.S."

266. JBS executives made similar statements throughout 2016 and 2017 and into 2018, regularly claiming that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.," "cattle price[s being] back to the normal level," and "strong demand for beef."

267. Instead of disclosing that the "improvement in EBITDA margin" was the result of illegal profits from the conspiracy, JBS offered false business justifications such as "more cattle available in the U.S." and cattle prices returning "back to the normal level." JBS made all these false public statements to disguise its role and participation in the conspiracy.

### (iii) National Beef

268. To facilitate the conspiracy, National Beef, through its majority shareholders Jefferies Financial Group Inc. and later Marfrig Global Foods S.A., used public statements to conceal Defendants' unlawful activity.

269. For example, in October 2015, Jefferies stated that the anticipated expansion of the cowherd "bodes well for [meatpacking industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."

270.     In October 2016, Jefferies explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how, "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle ha[d] fallen from $1.48 to $1.16."

271.     Jefferies offered similar justifications throughout 2017 and 2018, such as "National Beef generated record results for [the last 12 months] on the back of a more balanced supply of cattle and robust end market demand," "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016," "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins," and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."

272.     These statements were made during Jefferies Financial Group investor presentations in 2015, 2016, 2017, or 2018 at which National Beef's CEO and President, Tim Klein, was scheduled to speak on topics related to National Beef's performance.

273.     Marfrig similarly offered false justifications for the low prices caused by the conspiracy after Marfrig acquired a controlling stake in National Beef.

274.     For example, Marfrig reported in November 2018 that, "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."

275.     In 2018, during a third-quarter company earnings call, Marfrig executives reiterated the preceding paragraph's point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and

international markets." Although Marfrig declared that it had attained record results and better margins while reducing cattle slaughter volumes, it misrepresented that these results were due to "fewer weeks in the third quarter 2018 compared to the third quarter 2017."

276. National Beef CEO, Timothy M. Klein—referred to by Marfrig CEO, Eduardo de Oliveira Miron, as "CEO of [Marfrig's] North American operation"—participated in the 2018 call.

277. Marfrig announced in the fourth quarter of 2018 that it attained a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."

278. Jefferies and Marfrig made these pretextual public statements on behalf of National Beef—which, as alleged above, was the original source of the pretextual public statements—to obscure their role and participation in the conspiracy. Instead of disclosing that their record results and better margins stemmed from the illegal prices implemented by the conspiracy, Jefferies and Marfrig claimed these results were due to ample supply of cattle, higher cattle availability, and strong demand.

### (iv) The Tyson Defendants

279. As discussed above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

280. To facilitate the conspiracy, Tyson Foods made public statements to conceal Defendants' unlawful activity. For example, Tyson Foods used its SEC filings from 2015 to 2018 to declare that it had "limited or no control" over the pricing and production of cattle because prices were "determined by constantly changing market forces of supply and demand."

281. As for the factors that influence the cost of cattle, Tyson identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and

demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."

282.    Tyson further stated that it "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with then-current cattle supplies." Tyson claimed that "[t]he beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."

283.    Rather than truthfully disclosing that the conspiracy improved its earnings, Tyson Foods issued false business justifications such as lower fed cattle costs and favorable market conditions. Tyson Foods made these misrepresentations to cover up its role and participation in the conspiracy.

284.    There was no truth to Defendants' foregoing statements. Rather, Defendants made them to mislead Plaintiff into believing they were acting legally as keeping Plaintiff in the dark would allow Defendants' price-fixing conspiracy to operate and for Defendants to profit from it.

**L.    Plaintiff Was Unable to Discover the Existence of Operating Defendants' Conspiracy**

285.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the filing of the cattle ranchers class action in the U.S. District Court for the Northern District of Illinois on April 23, 2019. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix prices for beef. Throughout the Conspiracy Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

286. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications.

287. Plaintiff only recently learned about Witness 1 upon the filing of cattle ranchers' complaint. Witness 1 offers direct evidence that the beef industry has been colluding to fix prices. Prior to the cattle ranchers' complaint and Witness 1's account therein, Plaintiff did not know and could not have known of the conspiracy and did not have any facts that would have reasonably put them on inquiry notice regarding the existence of the conspiracy.

288. Plaintiff also only recently learned about the USDA and DOJ investigations into price fixing in the beef industry, as early as March 12, 2020. Plaintiff did not learn and could not have learned about the USDA and DOJ investigations into price fixing in the beef industry at any time before March 12, 2020, when Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices as alleged above, and thus did not have any facts that would have reasonably put them on inquiry notice regarding the existence of the conspiracy.

289. Before Witness 1's account and the revelation of the government's investigations, no facts existed that could have or should have reasonably suggested or disclosed to Plaintiff the possibility of price fixing in the beef industry.

290. Operating Defendants' conspiracy, by its very nature, was self-concealing.

291. The beef industry is not exempt from antitrust regulation, and thus, before these recent events, Plaintiff reasonably considered it to be a competitive industry. Accordingly, a

reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Operating Defendants' beef prices and conduct before these recent events.

### M.     Plaintiff Exercised Due Diligence in Attempting to Discover its Claim [69]

292.    Plaintiff could not have learned of Operating Defendants' anticompetitive conduct until recently through public disclosures regarding Witness 1 and the existence of governmental investigations. Market conditions that Operating Defendants ascribed to legal behavior did not put Plaintiff on inquiry notice.

293.    Operating Defendants' concealment was successful—that is, because of their concealment, Plaintiff was unable to discover the existence of their antitrust claim.

294.    Because of Operating Defendants' fraudulent concealment, Plaintiff had insufficient information concerning Operating Defendants' misconduct on which to base a complaint and could not have discovered Operating Defendants' conspiracy.

295.    Defendants' affirmatively made public statements giving pretextual reasons for their record profits.

296.    Because of Defendants' misrepresentations, and Defendants' success and precision in cloaking their illegal behavior, Plaintiff lacked reasonable awareness of suspicious circumstances or storm warnings sufficient to trigger the duty to investigate.

297.    A reasonable person would not have discovered the conspiracy through any of Defendants' statements. As such, the most reasonable time for Plaintiff's duty to inquire to arise was not until after Witness 1's revelations and indication of the government's antitrust investigations became known.

---

[69] Since due diligence is an affirmative defense, Plaintiff needs not necessarily plead it here but does.

298.    Additionally, Plaintiff was a member of the direct purchaser class action complaint, as asserted against Defendants, including but not limited to, in *Samuels, et al. v. Cargill, et al.,* No. 0-20-cv-01319-JRT-MB (Dkt. No. 1) (D. Minn. June 6, 2020).

299.    Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities, during the pendency of the direct purchaser class action asserted against Defendants, commencing at least as early as June 6, 2020.

## V.    ANTITRUST INJURY

300.    The cattle market is an oligopsony consisting of the Operating Defendants, which purchase most of the cattle for slaughter and produce most of the beef sold in the wholesale market. When Operating Defendants colluded to restrict supply, the market became a joint monopsony that left Plaintiff with no choice but to accept whatever price Operating Defendants offered.

301.    In a competitive market, the volume of cattle purchased by beef producers (such as Defendants) would equal the volume where supply matches the demand/marginal revenue product curve, and the price for that cattle would be the additional revenue that the producers would receive for cattle.

302.    When Operating Defendants collaborated to restrict supply, they exercised their monopsony power to compel cattle ranchers to accept the price Operating Defendants offered, thus driving down the market price. In this manner, Operating Defendants' monopsony power enabled them to maximize their profit by purchasing fewer cattle at a lower price.

303.    Further, because imported beef was not offsetting the shortages that Operating Defendants created, the restricted supply of cattle caused a restricted supply of beef in the downstream market to direct purchasers like Plaintiff.

304. From the standpoint of direct purchasers of commodity beef, such as Plaintiff, Operating Defendants function as an oligopoly in control of most of the industry supply. When Operating Defendants colluded to restrict supply, the market for beef became a monopoly in which direct purchasers were forced to buy at prices dictated by Operating Defendants who acted in concert.

305. Because no other source was offsetting the shortages, Operating Defendants created the restricted supply of fed cattle, which in turn restricted the supply of beef in the downstream market to direct purchasers. Operating Defendants exacerbated this restriction through their concerted manipulation of slaughter capacity and processing volume.

306. Because Operating Defendants had and have accompanying downstream market power, they were able to maximize their profits by colluding to produce volumes based on their marginal revenue curve instead of the market demand curve, which increased prices that Plaintiff paid.

307. Because Operating Defendants did not fear competition from other meatpackers, Operating Defendants' collusion had the dual effect of (a) artificially decreasing the price that Operating Defendants paid for cattle; and (b) artificially increasing the price they charged for their beef products.

308. Operating Defendants' monopsony power and anticompetitive conduct had the following effects, among others:

- Price competition in the beef market was restrained or eliminated;

- Prices for beef sold by Operating Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, and, in turn, other beef producers, were

raised, maintained, and fixed at artificially high, noncompetitive levels throughout the United States;

- Direct purchasers of beef were deprived of free and open competition; and

- Direct purchasers paid artificially inflated prices.

309. The purpose of Operating Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of beef above a competitive level. As a direct and foreseeable result, Plaintiff paid supra-competitive prices for beef during the Conspiracy Period.

310. Defendants' violations of the Sherman Act caused Plaintiff to suffer injury to its businesses or property.

311. This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

## VI.   DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

312. A continuing violation can operate in two ways. First, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. Second, a continuing violation can occur where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiff.

### A.    Defendants Renewed their Conspiracy with New and Independent Acts

313. During the Conspiracy Period, Operating Defendants continued to make sales to Plaintiff of beef whose prices were fixed as the result of Operating Defendants' continually renewed and adjusted price-fixing agreement. Operating Defendants, acting collectively, needed to continually renew and adjust their price-fixing agreement to account for ever-fluctuating economic and market conditions.

314. Defendants' meetings and misrepresentations were among the overt acts that began a new statute of limitations because these events advanced the objectives of Defendants'

conspiracy. In addition, Defendants committed new overt acts each time that they took actions to implement their conspiracy, such as reducing and restraining the supply of processed beef from their actions in the purchasing of fed cattle, which occurred at each auction, and their decisions to curtail production at their processing plants.

315. Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Conspiracy Period. Each sale of beef by an Operating Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violation that injured Plaintiff and started the statutory period running again.

316. Defendants' overt acts, including, but not limited to those mentioned above, were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff.

317. This reality is most easily recognized when considering the pricing dynamics and slaughter reductions following the Holcomb fire and onset of COVID-19 discussed above.

**B.      Defendants Inflicted New and Accumulating Injury on Plaintiff**

318. Each purchase by Plaintiff through the Conspiracy Period of Operating Defendants' beef, the price of which resulted from Operating Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiff.

319. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff starts the statutory period running again regardless of the Plaintiff's knowledge of the alleged

illegality at much earlier times. This means that each illegally priced sale of beef to Plaintiff constituted a new cause of action for purposes of the statute of limitations.

320. Operating Defendants' conspiracy continued into the non-time-barred Conspiracy Period—that is, four years before the first cattle ranchers class action complaint was filed and alternatively four years before the filing of the first direct purchaser class action complaint.

321. As alleged throughout this complaint, Operating Defendants' price fixing began in at least 2015, and many of Plaintiff's factual assertions allege Operating Defendants' 2015 misconduct. But Plaintiff also alleges that Operating Defendants' misconduct continued throughout the Conspiracy Period.

322. Many of Operating Defendants' illegal acts occurred in 2015 and continued throughout the Conspiracy Period. *See supra* Section IV. C, D. (i)-(v) and Figures 1–3, 7-8 (describing Defendants' overt illegal acts beginning in 2015 and extending into the four-year period before the earlier related cattle ranchers class action complaint was first filed and alternatively four years before the filing of the first direct purchaser class complaint.)

323. Plaintiff alleges that Operating Defendants frequently coordinated and communicated with each other beginning in 2015 and throughout the Conspiracy Period. The fact that they maintained such communications makes plausible the allegation that their conspiracy continued from 2015 through the present. *See supra* Sections C and D (describing coordination and communications among Operating Defendants in 2015 and continuing throughout the Conspiracy Period). In this manner, Operating Defendants' conspiracy continued when their sales to Plaintiff were made during the four years preceding the filing of the first related cattle ranchers class action complaint, and in the alternative, during the four years preceding the filing of the first direct purchaser class complaint.

324.     Each of the beef industry's plus factors were present in 2015 and throughout the Conspiracy Period: high market concentration, commodity product, inelastic demand, high barriers to entry, and trade association meetings that occurred each year and provided the Operating Defendants the continual opportunity to conspire.

325.     Moreover, Defendants' conspiracy was intended to and did inflict continuing harm on Plaintiff as a result of their collective reduction and restraint on the supply of processed beef.

326.     In addition, to the extent that the Operating Defendants' conspiracy was intended to and did have the effect of reducing and restraining supply, it had a continuing effect because it takes 24 to 33 months to raise cattle for slaughter and that does not include the processing time.

327.     Finally, this complaint alleges that Operating Defendants sold beef directly to Plaintiff during the Conspiracy Period.

## VII.     COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT

328.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

329.     Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

330.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

331.     At least as early as 2015 and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to fix, raise, and stabilize the wholesale price for beef in the United States, thereby creating anticompetitive effects.

332.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for beef throughout the United States.

94

333. The conspiratorial acts and combinations have caused unreasonable restraints in the market for beef.

334. As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for beef.

335. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

    A.    Price competition in the sale of beef has been restrained, suppressed, and eliminated in the United States;

    B.    Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators have been fixed, raised, stabilized, and maintainedat artificially high, non-competitive levels throughout the United States; and

    C.    Plaintiff who directly purchased beef from Defendants, its divisions, subsidiaries, and affiliates, and co-conspirators, were deprived of the benefits of free and open competition in the purchase of beef.

336. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of beef to be higher than it would be but for Defendants' conduct.

337. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by paying more for beef than it would have paid and will pay in the absence of the conspiracy.

338. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

339. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

340. Plaintiff recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

341. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

342. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

343. Plaintiff recover its costs of suit, including reasonable attorneys' fees, as provided by law; and

344. Plaintiff have such other and further relief as the case may require and the Court may deem just and proper.

## IX.     JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

October 31, 2023                           Respectfully submitted,

                                           s/ David C. Eddy
                                           David C. Eddy (N.D. Illinois Bar No. 72258)
                                           Dennis J. Lynch (N.D. Illinois Bar No. 07622)
                                           MAYNARD NEXSEN PC
                                           1230 Main Street, Suite 700
                                           Columbia, SC 29201
                                           Telephone: (803) 771-8900
                                           Facsimile: (803) 253-8277

                                           deddy@maynardnexsen.com
                                           dlynch@maynardnexsen.com

                                           *Attorneys for Plaintiff Conagra Brands, Inc.*